UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

STEVEN AMERIO and ANDREW GOLDBERG,
Individually and as Co-Lead Plaintiffs on behalf all others
similarly situated, as a class,

*Plaintiffs,*

-against-

GREGORY W. GRAY, JR.; GREGORY P. EDWARDS;
ARCHIPEL CAPITAL LLC; BIM MANAGEMENT LP;
BENNINGTON INVESTMENT MANAGEMENT,
INC.;; and against all in a representative and fiduciary
capacity as acting GENERAL PARTNERS and
CONTROL MEMBERS of BENNINGTON –EVERLOOP
LP,; ARCHIPEL CAPITAL – AGRIVIDA LLC;
ARCHIPEL CAPITAL –BLOOM ENERGY LP;
ARCHIPEL CAPITAL - LATE STAGE FUND LP;
ARCHIPEL CAPITAL –  LINEAGEN LP; ARCHIPEL
CAPITAL –  SOCIAL MEDIA FUND LP, (1, 2, 3 & 4),
and against each said funds Individually as Limited
Partnership Enterprises and as Attorneys and Publishers of
all Private Placement Memorandums in connection with
each/any/or all of the above entities; and Jane Does and
Mary Roes (#1-10)

*Defendants.*

_____

| |
|---|
| **SECOND AMENDED CLASS ACTION COMPLAINT** |
| Civil Case No.: 5:15 CV-00538 (DNH/TWD) |
| JURY TRIAL DEMANDED |

## SUMMARY OF ALLEGATIONS[1]

_____

[1]      On August 2, 2016, this Court issued its Memorandum, Decision and Order (ECF No. 81, reported as *Goldberg v. Gray,* 2016 WL 4099189 (N.D.N.Y. Aug. 2, 2016) (the "August 2016 Order"), adjudicating (1) a motion to dismiss filed by Defendants Nixon Peabody, LLP and John Koeppel (the "Nixon Defendants") (ECF No. 60), and (2) a motion to dismiss filed by Defendants Gregory P. Edwards and Bennington Investment Management, Inc. (the "Bennington Defendants") (ECF No. 61).  In the August 2016 Order, this Court dismissed with prejudice Plaintiff Goldberg's claims against the Nixon Defendants, and dismissed with prejudice certain of the claims asserted by Plaintiff Goldberg against the Bennington Defendants. ECF No. 81 at 14, 17, 18, 19, 20, 22-23, 24-25, 26, 27, -28, 29-30, and 32.  To preserve the dismissed claims for

1.     This is an action brought by Plaintiffs, Steven Amerio and Andrew Goldberg, on behalf of themselves and all others similarly situated, to stop Defendant GRAY, individually, Defendant EDWARDS, individually, and BIM MANAGEMENT, LP, and Defendant BENNINGTON INVESTMENT MANAGEMENT, INC., together and in concert with NIXON PEABODY, LLP and through a number of ARCHIPEL entities controlled by GRAY, EDWARDS, ARCHIPEL, and BIM from engaging in ongoing fraudulent conduct designed to defraud investors who or that have invested in various ARCHIPEL/BIM-managed investment funds, and to have the said Defendants return the funds that they have already taken from the investors under false and fraudulent circumstances created by the Defendants, and each of them.

2.     From 2011untilthe freezing of the Archipel Entity's assets by the federal government, GRAY, EDWARDS, ARCHIPEL (funds), and BIM have, in concert with one another and together, by certain officers and/or employees of the respective companies, raised nearly $20 million from at least 140 investors throughout the United States  and abroad. While each of the ARCHIPEL Entities has been set up to have its own bank account, from at least September 2011 GRAY, EDWARDS and the companies they control, have commingled and transferred funds among the ARCHIPEL Entities as t h e y wished, funding one ARCHIPEL Entity's investment in a portfolio company with funds transferred  from

---

appellate review, Plaintiffs continue to state herein the factual allegations concerning the Nixon Defendants and the Bennington Defendants set forth in their Amended Class Action Complaint (ECF No. 53) while, at the same time, making clear which legal claim is asserted against which of the remaining Defendants for the purpose of pursuing the litigation to final judgment.  By Order entered on January 27,2017 [Dkt. No. 95], the within action was discontinued as against Defendants Archipel Capital-Agrivida, LLC, Archipel Capital-Bloom Energy, LP, Archipel Capital-Late Stage Fund, LP, Archipel Capital-Social Media Fund, LP, Archipel Capital-Social Media Fund II, LP, Archipel Capital Social Media Fund 3, LP, Bennington-Everloop, LP, and Archipel Capital-Lineagen, LP.

other ARCHIPEL Entities.

3.     From at least May 2011, GRAY, EDWARDS, ARCHIPEL, BIM, BENNINGTON INVESTMENT MANAGEMENT, INC. ("BENNINGTON"), and other companies owned and controlled by these individuals and entities, together with the help, assistance, and legal expertise of NIXON PEABODY, LLP, by and through that law firm's agents, officers and/or employees, raised money from investors by making wholesale misrepresentations of material facts, all designed in a way to prevent the investors they pitched from knowing the real truth about the investments they were seeking investments for, and to hide from investors the fact that GRAY had been sanctioned by FINRA, and the New York Stock Exchange, to the point where he was forced to give up his license and leave the brokerage world of finance.  The Defendants withheld from the investors significant facts and circumstances of GRAY's past dealings, his fraudulent churning and misuse of customer money, and his serial threats that he made to investors when they dared to question his motives and activities.  Together and in concert, the Defendants collaborated together in such a fashion so as to prepare, print and deliver to prospective investors, PPM's and other marketing materials that were false, fraudulent, and purposely designed so as to prevent the consuming public and the targeted investors from knowing about the true facts and circumstances of GRAY's background, and fraudulently held out GRAY to the public at large as an investment expert, and a registered wealth advisor, when each of the factual statements were false and fraudulent, and designed only to give investors the belief that GRAY was an expert in his field, with a  stellar background in equity finance.

4.     Upon information and belief, and before May 2011, GRAY had disclosed to NIXON PEABODY, LLP, and specifically John Koeppel, a partner of that law firm, that

GRAY had been the subject of severe discipline while working with brokerage firms, in that he misused his customers' money without their knowledge and consent, and when confronted by the client for his misdeeds, threatened to kill the customer, and do other bodily harm to them if they continued to go forward with their complaints.  As a result of these activities, GRAY was censured and barred from selling to the public for a period of three (3) years.  In February 2008, he surrendered his license for trading.  To date, he has not recovered his license.

5.      However, this information was not placed into the Private Placement Memorandums (PPM's) that were generated by and sponsored by GRAY, EDWARDS, BIM, BENNINGTON and NIXON PEABODY, LLP.  The Defendants and their lawyer and law firm decided to keep this information private, and not share this information with the potential investors who were being given the PPM's by GRAY, EDWARDS, BIM, BENNINGTON, and NIXON PEABODY, LLP.  In addition to this failure to share necessary information, either as a biographical statement or as a risk factor in the PPM's, the Defendants, and each of them, jointly, severally, and in concert with one another, drafted a biographical presentation for GRAY that was filled with statements and falsities, including the fact that he was a registered wealth advisor.  These representations and the failure to disclose the negative disciplinary action against GRAY, were such that the Defendants violated applicable securities laws and regulations, and otherwise that the Defendants sought to raise money for the ARCHIPEL enterprises in a false and fraudulent manner, both through the PPM's and through other fraudulent statements and claims made with respect to the various entities formed by GRAY and EDWARDS, together with BIM, BENNINGTON, NIXONPEABODY, LLP and JOHN KOEPPEL.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331, the Private Securities Litigation Reform Act of 1995, Sections 20(b), 20(d) and 22(a)

of the Securities Act of 1933 (15 U.S.C. §§ 77t(b), 77t(d), 77v(a)], Sections 2l(d).21(e), and

27 of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78u (d), 78u (e), and 78aa], and

Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

7.     Venue is proper in this District pursuant to 28 U.S.C.§1391(b)(2), Section 22(a)

of the Securities Act [15 U.S.C. § 77v (a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa],

and Section 214 of the Advisers Act [15 U.S.C. § 80b-14J]. Many of the investors within the

Class either live in, are employed, or own businesses within the Northern District of New York.

Many if not most of the events constituting or giving rise to the alleged violations occurred in the

Northern District of New York.  For instance, many of the solicitations of the Plaintiffs and Class

members as investors was done in the Northern District, and particularly in the Syracuse, New

York area, as there were numerous meet-and-greets that were sponsored by the Defendants where

they looked for investors in and around the County of Onondaga and State of New York.

Additionally, many of the checks for the investments were generated from Central New York,

and specifically within Onondaga County, and said checks were delivered within the Northern

District and within the State of New York.  Upon information and belief, certain wire transfers to

ARCHIPEL entities were initiated within Central New York and in and around Onondaga

County, and delivered to the New York offices of several major banks, including Bank of

America and M&T among others that have major offices within the County of Onondaga, City

of Syracuse, and/or State of New York within the Northern District.

8.     In connection with the conduct alleged in this complaint, the Defendants,

directly or indirectly, have made use of the means or instruments of transmission or communications in, and throughout the United States, and the means or instrumentalities of interstate commerce, the mails, express trucking, airplane and delivery services, all of which inform and are applicable to the use of Interstate Commerce, where the lies, misrepresentations and other falsities were transmitted solely for the purpose of obtaining investor money for the sole and unencumbered use of the Defendants herein.

## **DEFENDANTS**

9.     GREGORY W. GRAY, Jr. who is currently in federal custody following his federal criminal conviction, formerly lived in Buffalo, New York, and had a principal place of business for his ARCHIPEL Companies located at 1716 Main Street, Suite 100, Buffalo, New York, 14209.  GRAY has or had additional residences located in Chicago, Illinois, and Lake Worth, Florida.

10.     Upon information and belief**,** GRAY founded ARCHIPEL CAPITAL, LLC in 2005, and is and has been its Managing Partner.  GRAY is also one of two general partners of BIM MANAGEMENT LP, the other general partner being EDWARDS.  EDWARDS is also Chairman of the Board of ARCHIPEL CAPITAL, LLC.

11.     Upon information and belief, Defendant GREGORY P. EDWARDS is a resident of the City of Toronto, Province of Ontario, Canada.  At all times relevant herein, Defendant EDWARDS resided at 12 Moorehill Drive, Toronto, ON M4G 1A1, Canada.

12.     Upon information and belief, Defendant EDWARDS was Chairman of the Board of ARCHIPEL CAPITAL, LLC and each and every one of the ARCHIPEL companies.  As such, Edwards was a control person of ARCHIPEL CAPITAL, LLC and its members, as well as a control person of each and every ARCHIPEL entity (fund).  Also,

6

EDWARDS was a member of the Board of Directors of EVERLOOP, LP.

13.     Additionally, EDWARDS was a general partner of BIM, and was a control person of that entity.  He additionally was the sole owner of BENNINGTON INVESTMENT MANAGEMENT, INC., a Canadian Corporation that was doing business within the State of New York.

14.     Upon information and belief, BENNINGTON was incorporated to assist GRAY in landing the EVERLOOP transaction, as the EVERLOOP CEO, Hilary Decesare felt uncomfortable with GRAY only because of his disciplinary history.

15.     Upon information and belief, Defendant GRAY was an advisor to BENNINGTON INVESTMENT MANAGEMENT, INC.

16.     Upon information and belief, BENNINGTON was formed by EDWARDS as a result of an issue that the CEO of EVERLOOP had with GRAY and specifically GRAY's disciplinary background.

17.      In December 2008, GRAY was censured and barred for three years from association with NYSE member firms based on findings that he had (a) engaged in unauthorized trades in several of his customers' accounts and (b) threatened and/or harassed complaining customers and/or their family members, some with the threat of death. This bar was upheld by the New York Stock Exchange Appeals Commission on July 22, 2009 *(In the Matter of Gregory W Gray,* Jr., ReL No. 60361 (July 22, 2009).).  GRAY surrendered his license in February 2008.

18.     ARCHIPEL CAPITAL, LLC is a New York limited liability company, founded in 2005 and incorporated on May 15, 2006, with its principal place of business located at 1716 Main Street, Suite 100, Buffalo, NY.

19.     Upon information and belief, GRAY is and at all times herein mentioned was the owner of 65.1% of ARCHIPEL's membership interests, and ARCHIPEL is the Co-owner of BIM.  ARCHIPEL's other membership interests are owned by two of GRAY's business associates, GREGORY P. EDWARDS (25%) and ANTHONY ORAM (9.9%). ARCHIPEL has no assets or employees, but is used by GRAY, EDWARDS and ORAM primarily as a "brand."

20.     BIM is a Delaware limited partnership incorporated on May 10, 2011, with its principal place of business located at 1716 Main Street, Suite 100, Buffalo, NY.  BIM is owned by ARCHIPEL and a Toronto, Ontario, based entity, BENNINGTON INVESTMENT MANAGEMNT, INC. ("BENNINGTON").  Like ARCHIPEL, BIM is owned by GRAY, and his two business associates, in the same percentages as the ownership of ARCHIPEL, BENNINGTON is owned 100% by EDWARDS.

21.     BIM is the General Partner or Managing Member of each of the ARCHIPEL Entities, and GRAY directs and has directed BIM's investment and operational activities, in conjunction with EDWARDS, who GRAY calls the "Godfather."  Although BIM was entitled to take a 5% up-front management fee on each new investment into the ARCHIPEL Entities, in practice, GRAY simply helped himself to the ARCHIPEL Entities' bank accounts whenever he wanted to, taking many times in excess of the 5% management fee.

22.     Upon information and belief, ARCHIPEL-AGRIVIDA, LLC ("AGRIVIDA, LLC") is a Delaware limited liability corporation incorporated on or about July 28, 2011, with its principal place of business in Buffalo, NY. The LLC was organized by GRAY and the other Defendants with the purpose of acquiring Series B+ Preferred Stock of Agrivida, Inc. BIM is the Managing Member of AGRIVIDA LLC. Since its inception, AGRIVIDA,

LLC raised $385,000.00 from 13 investors.

23.    Upon information and belief, ARCHIPEL CAPITAL—BLOOM ENERGY, LP (BLOOM LP") is a Delaware limited partnership incorporated on February 24, 2012, with its principal place of business located at the ARCHIPEL offices in Buffalo, NY. BLOOM, LP was formed by GRAY with the purpose of acquiring common stock and capital stock of Bloom Energy Corp. BIM is the General Partner of BLOOM, LP. Since its inception, Bloom Energy LP has raised $3,160,566.25 from 32 investors. Upon information and belief, an investor residing in China has agreed to invest $470,000 in Bloom Energy LP in recent weeks.

24.    ARCHIPEL CAPITAL—LATE STAGE FUND, LP ("LATE STAGE FUND, LP") is a Delaware limited partnership incorporated on May 9, 2014, with its principal place of business located at the ARCHIPEL offices in Buffalo, NY. According to the Defendants, the purpose of the LATE STAGE FUND, LP is to acquire shares in a portfolio of companies, largely venture-capital- backed, late-stage companies, and with pre-IPO shares of Uber being the partnership's primary intended holding. Upon information and belief, BIM is the General Partner of LATE STAGE FUND LP. Since its inception, LATE STAGE FUND LP has raised $6,020,640.00 from nine investors.

25.    Upon information and belief, ARCHIPEL CAPITAL—LINEAGEN, LP ("LINEAGEN, LP") is a Delaware limited partnership formed and filed on or about February 24, 2012, and has its principal place of business located at the ARCHIPEL offices in Buffalo, NY. The stated purpose of LINEAGEN, LP is to acquire Series B and Series C Convertible Preferred Stock of LINEAGEN, Inc. BIM is the General Partner of LINEAGEN LP. Since its inception, LINEAGEN, LP has raised $1,888,876.91 from 28

investors.

26.     ARCHIPEL CAPITAL—SOCIAL MEDIA FUND, LP ("SOCIAL MEDIA FUND LP") is a Delaware limited partnership formed and filed on or about May 17, 2012, with its principal place of business located at the ARCHIPEL offices in Buffalo, NY. The stated purpose of SOCIAL MEDIA FUND, LP is to invest in portfolio companies in the social media industry, in particular Twitter.  BIM is the General Partner of the SOCIAL MEDIA FUND, LP.  Since its inception, SOCIAL MEDIA FUND, LP has raised $2,396,618.99 from 46 investors.

27.     ARCHIPEL CAPITAL—SOCIAL MEDIA FUND II LP ("SOCIAL MEDIA FUND II LP") is a Delaware limited partnership formed and filed on or about September 11, 2013, with its principal place of business located at the ARCHIPEL offices in Buffalo, NY, with the purpose of investing in portfolio companies in the social media industry, in particular Twitter. BIM is the General Partner of SOCIAL MEDIA FUND II LP. Since its inception, SOCIAL MEDIA FUND II LP has raised $1,268,473 .50 from one investor.

28.     ARCHIPEL CAPITAL—SOCIAL MEDIA FUND 3, LP ("SOCIAL MEDIA FUND 3 LP") is a Delaware limited partnership formed and filed on or about March 20, 2014. Its principal place of business is located in the ARCHIPEL offices in Buffalo, NY, with the purpose of investing in portfolio companies in the social media industry, in particular Twitter. BIM is the General Partner of SOCIAL MEDIA FUND 3 LP. Since its inception, SOCIAL MEDIA FUND 3 LP has raised $l,300,000.00 from two investors.

29.     ARCHIPEL CAPITAL – SOCIAL MEDIA FUND 4, LP ("SOCIAL MEDIA FUND 4, LP ") is a Delaware limited partnership formed and filed on or about March 20, 2014, with its principal place of business located in Buffalo, NY, with the purpose of investing in portfolio companies in the social media industry, in particular

Twitter.  BIM is the general partner of SOCIAL MEDIA FUND 4, LP and has raised to date $275,000 from three investors.  For purposes of this Second Amended Complaint, all of the Social Media Funds will be referred to collectively as the "SOCIAL MEDIA FUND, LP", as the four entities did not have separate offering documents and shared one bank account.

30.     Upon information and belief, GRAY founded ARCHIPEL in 2005.  ARCHIPEL is "branded" by GRAY and EDWARDS as a venture capital company.  GRAY is the Senior Managing Director. EDWARDS is the Chairman of the ARCHIPEL board.

31.     Upon information and belief, in the Spring of 2011, GRAY began to solicit investments from individual investors and small investment entities promising interests in the ARCHIPEL entities that the Defendants had formed to that date and were to form in the future.

32.     Once the investor money was delivered, the model called for GRAY to invest the investor money into a private company or companies that GRAY and the ARCHIPEL Defendants believed would soon realize a "liquidity event" (*i.*e., an initial public offering or merger or acquisition).

33.     Upon information and belief, from 2011 to the present GRAY and the Defendants have raised approximately $19.6 million in investments from at least 140 individuals and investors for at least six (6) offerings of the ARCHIPEL Entities.

34.     Upon information and belief, the amounts raised for each of the ARCHIPEL Entities are set forth as follows:

| Offering | Purported Investment | Dates Funds Were Raised | Amount Offered | Amount Raised | Number of Investors |
|---|---|---|---|---|---|
| Bennington – Everloop LP | Everloop, Inc. | 4/2011 to 10/2012 | $5.5 million, up to $10 million | $2,913,131.19 | 68 |
| Archipel Capital – Agrivida LLC | Agrivida, Inc. | 7/2011 ro | $7.5 million | $385,000.00 | 13 |
| Archipel Capital – Bloom Energy LP | Bloom Energy Corp. | 3/2012 to | $5 million | $3,160,566.25 | 22 |
| Archipel Capital – . Social Media Fund LP | Twitter_ Inc. and "portfolio companies in the social media industry" | 6/2012 to 11/2013 | $5.5 million | $5,240,092.49 | 51 |
| | | | $7 million | $1,888,876.91 | 28 |
| | | 3/2014 to present | | | |
| Archipel Capital – | Uber Technologies, Inc. and "a portfolio of companies, with the majority of them being venture capital backed, late stage companies" | 6/2014 to present | $15 million | $6,020,640.00 | 41 |

35.     BENNINGTON –EVERLOOP, LP ("BELP"), is a Delaware limited partnership that was formed in May of 2011 for the purpose of investing in EVERLOOP, INC.  At all pertinent times herein EVERLOOP and BELP were doing business within the State of California, but GRAY in and through ARCHIPEL CAPITAL sought investors in Syracuse New York, a place where GRAY grew up through his high school years, and where he had many contacts.   Using those contacts, Gray sought to seek investors for the BENNINGTON-EVERLOOP, LP.

36.     EVERLOOP, INC. ("EVERLOOP") is a company incorporated within the State of California, with its headquarters and principle place of business located in Danville, California. EVERLOOP was presented by GRAY and the other Defendants to be a company that operates and/or has operated as a social media "looping platform" for

"tween" girls and boys who are not yet old enough to legally access sites like Facebook. The ARCHIPEL Defendants and others presented EVERLOOP to be a safe and private network for tweens that was compliant with the Children's Online Protection Act (COPPA).

37.     GRAY and the ARCHIPEL Defendants, together with the lead personnel from EVERLOOP, touted the company as one that enables its customers and users to participate in collaborative learning and school projects, share information about their sports teams and clubs, play games, customize their profile pages, and communicate in real time with friends they know who are part of the EVERLOOP system.  The claims made by GRAY and the other ARCHIPEL Defendants also touted EVERLOOP's software that allowed for the customization for real time communications including email, IM, chat, and voice to its users.

38.     Hilary Decesare ("DECESARE") was the founding member of EVERLOOP, and acted as the Chief Executive Officer of EVERLOOP, and a member of the EVERLOOP Board of Directors.

39.     As detailed below, through a series of concealments, false promises, and outright misrepresentations of material facts, BELP's investors were induced to invest millions of dollars in EVERLOOP.  Between 2011 and 2013, GRAY and the ARCHIPEL Defendants both individually and in concert with DECESARE and others, and their executive management teams, agents, officers and/or employees, together with the respective Boards of Directors and with the knowledge and consent of the partners, employees, agents, owners and the particular knowledge of the Boards of all of the respective companies. In particular, GRAY, BIM, EDWARDS, BENNINGTON and NIXON PEABODY, LLP and the respective Boards of Directors delivered misinformation

and misrepresentations of material facts to the prospective and actual BELP investors, concealed material information from the BELP investors and other investors, and otherwise failed to take action to protect the investors of BELP and otherwise breached each of the ARCHIPEL companies duties that the General Partners owed to the investors in accord with the fiduciary capacity that each of the ARCHIPEL control group owed to the investors. Based on the misinformation, misrepresentations, and the concealment of material and distinctly relevant facts and information, the investors infused significant sums into BELP, a company that it was later proven to be a failed venture.

40.    Upon information and belief, in January 2011, GRAY, EDWARDS and DECESARE were introduced, and several investment opportunities were said to exist in EVERLOOP.  The Executive Summary of EVERLOOP stated that EVERLOOP was looking for a cash infusion from investors in the amount of $2,000,000.  The funds were to be used for the expansion of the social looping system, intellectual property of EVERLOOP, to open the social and gaming programming interface of EVERLOOP, to launch the first SN for Tweens, to allow for a credit cross-platform engine, and for the opening of the first Tween store, all together with subscriber acquisition.  The Executive Summary also provided for revenue forecasts of a break-even cash flow in 2012, revenues of $23,795,510 in 2011, and by 2012 revenues of $58,761,896.

41.    The Defendants herein and other agents, officers and/or employees of the ARCHIPEL-BIM companies, upon the initiative of the Defendants herein, further stated that EVERLOOP would be directly integrated into school systems, and that EVERLOOP had already signed a letter of intent that would put EVERLOOP into 50,000 schools nationwide.  In addition to listing its own Executive Management Team, the Executive

Summary also documented an impressive list of strategic advisors to the company including top executives at LeapFrog, McAfee, CBS, and Nickelodeon, among others. They provided an Executive Summary that stated EVERLOOP was pursuing key, promotional private label marketing campaigns. The Defendants herein and the other agents, officers and/or employees of the ARCHIPEL companies and BIM represented further that EVERLOOP already had impressive strategic partnerships with: Activision; Girl Scouts of America; American Youth Soccer Organization ("AYSO"); Applebee's; Mochi; hub; Mad Science; and R U There?

42. The ARCHIPEL-BIM (including GRAY and EDWARDS) Defendants herein, together with DECESARE and the other agents, officers, and/or employees of the ARCHIPEL companies, at the instance of the Defendants, herein represented also that EVERLOOP had obtained a Real Time Learning Grant (Federal) for $25 million to build the world's largest learning social network and educational trans-media platform. They also represented that EVERLOOP had obtained a National Science Foundation (NSF) Grant for $2 million to build science based "exploration" applications and social games. They further stated that EVERLOOP had a joint venture with Marc Ecko, Don Moody and The Learning Box, as well as a joint venture with The Kids Science College.  None of this was true.

43. Statements made by GRAY and DECESARE noted that a critical part of the EVERLOOP strategy revolved around user acquisition for the company.  On or about February 15, 2011, it was announced that EVERLOOP and I-SAFE Inc. ("I-SAFE") were, together, launching the nation's largest system of learning channel networks for K-8 Schools. I-SAFE was a well-known not for profit company with the largest digital literacy education publisher in the United States, and has worldwide distribution capabilities.

44.     I-SAFE also had a school footprint that included over 4,700 school districts and over 56,000 K-12 Schools, with hundreds of educators and 32 million students trained in using the I-SAFE curriculum.  It was also represented that I-SAFE was doing business in 33 countries throughout the world.

45.     GRAY, BIM, and the other agents, officers, employees and agents repeatedly confirmed and represented that EVERLOOP had a strategic partnership with I-SAFE, and that they had a contract with I-SAFE confirming the ongoing partnership.  The Plaintiff's herein were assured that EVERLOOP would be directly integrated into the school systems and that I-SAFE was launching EVERLOOP in 56,000 US schools.  The Defendants represented that the alliance with I-SAFE was the cornerstone of EVERLOOP's marketing and customer acquisition strategy within the United States and abroad.  GRAY, the ARCHIPEL Defendants, and DECESARE, together with other agents, officers and employees of the Defendants herein told investors that EVERLOOP and I-SAFE would be launching the largest series of school social learning networks in the country.

46.     The representations about the partnership with I-SAFE were false.  No partnership or agreement ever existed with I-SAFE.  In fact, there was an agreement with I-SAFE, LLC, a start-up company that was put together by an investor in EVERLOOP.  At no time was there ever any agreement with I-SAFE INC. that had any possibility of success.  Despite the knowledge that GRAY and EDWARDS and the ARCHIPEL Defendants had of this fact, they nonetheless touted and represented that this partnership was happening and in the works to allow EVERLOOP to have the stellar expansion that was being represented.

47.     Upon information and belief, in return for the investment in EVERLOOP, EDWARDS was given a seat on the Board of Directors of the Company, and GRAY was

given an advisory of non-participation seat on the EVERLOOP Board. Each of them knew of the deficiencies, misrepresentations of material facts, and the concealment of material facts of the EVERLOOP Company and its CEO, and yet they continued to raise money for EVERLOOP, thus enabling GRAY and the ARCHIPEL Defendants the ability and access to the money being raised. If they did not know of the lies and misrepresentations, they reasonably should have known, and either way breached their fiduciary responsibilities to the BELP investors.

48.    It was expressly understood in the Private Placement Memorandum (PPM) of BELP and other investment materials that were delivered to Plaintiffs and Class members, that each of the two, GRAY and EDWARDS, would have seats on the EVERLOOP Board, one an official seat and the other an advisory seat. If the Defendants did not know of all of the lies and misrepresentations that were streaming out of EVERLOOP, they certainly should have, both in their Board capacity with EVERLOOP, and the fiduciary capacity that they had as the General Partner for the BELP Partnership.

49.    But the misrepresentations did not stop there. There were material misrepresentations and omissions in the PPM that was distributed by GRAY, EDWARDS, and the ARCHIPEL Defendants concerning the formation of the BELP Partnership. Omitted from the Biographical Section, and the Risk Section of the PPM was material background information concerning GRAY that involved his previous disciplinary issues with FINRA, and the New York Stock Exchange. He had been accused of, and found liable for, using money of customers that he represented for his own purpose, and when challenged on this illegal use, he threatened the customers with bodily harm and otherwise harassed them. In two cases, Gray threatened to kill the customers. Having been found guilty of these charges,

he was censured by the Board of the Exchange, and he was barred from trading securities for at least three years, in a finding made by the examining Board.   In February 2008 he surrendered his license, and never has recouped the license.

50.    Upon information and belief, this information was material information which, under the applicable securities laws, must be included in any sales material or PPM.  In each of the ARCHIPEL Partnership Private Placement Memorandums, this critical information was omitted (except for the last one, which the Plaintiffs herein did not become involved). In addition, in the materials submitted to prospective investors, GRAY, BIM, EDWARDS and BENNINGTON, held GRAY out as "a registered investment advisor for NASD Licenses: series 6, 7, 63, 64".   This was a fabrication because he was not a registered investment advisor.

51.    Upon information and belief, GRAY told this information to the lawyer for the different ARCHIPEL entities, John Koeppel, Esq. a partner, at NIXON-PEABODY, LLP. Instead of including the information that was so material to GRAY'S background and disciplinary history, Koeppel and NIXON made the decision to omit that background from GRAY's biography.   Also, despite the fact that GRAY was not a registered investment advisor, GRAY, Koeppel and NIXON added that to GRAY's biography.   GRAY, Koeppel, and NIXON also decided not to include that disciplinary background of GRAY in the RISK section of the PPM's.  NIXON PEABODY, LLP developed, wrote, finalized and had printed the PPM's that were used by ARCHIPEL companies and partnerships in the ARCHIPEL investor fund raising activities.   The same information was provided in all PPM's in which the Plaintiff's herein invested.   The same misrepresentations, and material omissions were fully contained and omitted in each PPM.

52.     Additionally, the PPM touted GRAY as an Advisory Board Member of BENNINGTON.  This was done as an accommodation by EDWARDS to give added credibility to GRAY, given the doubts that DECESARE had with regard to GRAY. BENNINGTON really had no use or value except to act as cover for GRAY as he and EDWARDS sought out to raise money for EVERLOOP.  Having EDWARDS involved gave GRAY the credibility and the ability to have EDWARDS on the Board of EVERLOOP—an item that was heavily relied upon by GRAY and EDWARDS in the PPM's.

53.     None of the aforesaid information was shared with the investors in any of the investment limited partnerships or LLC, except in the Late Stage Fund PPM.  Prior to that, despite the knowledge that the EVERLOOP information was not true, and despite the fact that GRAY's disciplinary past was not released or made known to the investors, GRAY, EDWARDS, BIM, and BENNINGTON went forward using the false information presented in the PPM's to the investors, and otherwise falsely asking for their money for investment in BELP.

54.     In May 2011, GRAY and the other Defendants started the fund–raising for BELP.  As GRAY, DECESARE, and other agents, officers, employees and others made the rounds with investor meetings in Central New York, the misrepresentations and omissions were used to convince investors to invest in BELP.  Many investors did invest, including Plaintiffs and Class members.  Upon investing, it was all done upon the belief that everything was on the up-and-up, and that the information provided was the truth and that there was great promise for EVERLOOP.  In reality, there was no hope for EVERLOOP by the Summer of 2011.  In reality, GRAY's background as misrepresented in the PPM's and without the disciplinary background being exposed allowed a false sense of reliance upon

the BELP investors.

55.     Had the investors known the extent of the misrepresentations and the lies, as well as the depth and substance of the omissions concerning GRAY's disciplinary background, none of the investors would have invested in the BELP partnership.   Only because of the fraud, misrepresentations and material omissions did Plaintiffs and Class members invest in the BELP partnership and others.

56.     Even after the first group of investors invested in BELP, and then BELP into EVERLOOP, GRAY, BIM, and DECESARE and EVERLOOP continued to represent that EVERLOOP had a viable and existing relationship with I-SAFE that would drive EVERLOOP usership.   For example, in February 2012, GRAY, BIM and agents, officers, and/or employees of BIM and ARCHIPEL, together with DECESARE told BELP investors that I-SAFE was being beta tested in schools in Florida and Nebraska. Upon information and belief, that statement was false at the time it was made as both GRAY and DECESARE were already aware that any potential partnership relationship between I-SAFE and EVERLOOP had fallen through long before.   If GRAY did not know that, then he and EDWARDS were in woeful breach of their fiduciary duty as Board Members and as sponsors and control people for the BELP partnership and the investors in BELP.

57.     As time went on, the Defendants herein, in concert with EVERLOOP, and each other, made additional material misrepresentations and concealed information from the investing Plaintiffs herein. In or about March 2011, DECESARE and GRAY told other potential investors that EVERLOOP obtained permission to start a COPPA compliant Twitter-like application for children called EverText. Plaintiffs were told that, utilizing privacy protection technologies, EVERLOOP's real-time moderated text messaging would enable

kids to securely use mobile devices to broadcast updates to friends' profiles within EVERLOOP or direct to their cell phones.

58.    In June 2011, GRAY delivered to prospective and actual investors an EVERLOOP press release announcing the summer 2011 launch of EverText. Not disclosed to the BELP investors, the EverText product never actually existed beyond a development stage and could not have been positioned to launch, as represented, in the Summer of 2011. Yet, at no time did EVERLOOP, its founders or any of its officers or directors, including GRAY and EDWARDS ever reveal or disclose this fact to the BELP current and prospective investors. To the contrary, GRAY, DECESARE and other agents, officers or employees of ARCHIPEL, and the ARCHIPEL Defendants frequently cited the EverText technology and platform as a huge user driver with spin-off potential for EVERLOOP, claiming that EVERLOOP was in negotiations with Rogers Wireless and other wireless carriers regarding EverText. The officers and directors, (including GRAY and EDWARDS) of EVERLOOP remained silent on this point despite full knowledge of the truth and their obligation and duty. GRAY and the BELP sponsors, GRAY, ARCHIPEL, BIM, BENNINGTON, and EDWARDS not only remained silent, they actually used the false information to get yet more investors to contribute to the BELP partnership, despite the unsettling knowledge they knew or certainly should have known, that these representations were false. These misrepresentations and concealments of information were perpetrated by GRAY, EDWARDS, BIM, BENNINGTON and other agents, officers or employees of ARCHIPEL and/or BIM together with DECESARE, acting on behalf of EVERLOOP, such false statements and concealments were made and concealed knowing material facts were being hidden from BELP investors herein and intending to induce reliance and procure investment in BELP

and EVERLOOP.

59.     The ARCHIPEL Defendants and DECESARE and EVERLOOP continued to make misrepresentations about EverText and its status in 2012 and 2013. For example, in January 2012, the ARCHIPEL Defendants and DECESARE and EVERLOOP disseminated user growth figures for 2011 reflecting that EVERLOOP's user base had grown from approximately 5,000 in October 2010 to approximately 74,000 by December 2011. The dramatic spike in user numbers was attributed to the supposed launch of EverText in or about October 2011. Upon information and belief, the EverText product never actually existed beyond a development stage and could not have dramatically impacted EVERLOOP user growth as GRAY, the ARCHIPEL Defendants, EVERLOOP and DECESARE reported to investors in 2012. The ARCHIPEL Defendants, DECESARE and EVERLOOP's officers and directors remained silent regarding the true state of this technology despite full knowledge of the truth and an obligation and duty to protect the company and its shareholders. The same was true for the ARCHIPEL Defendants. These misrepresentations and concealments of information were perpetrated by GRAY and the ARCHIPEL Defendants, DECESARE, acting on behalf of EVERLOOP, and by the officers and directors of EVERLOOP, including Ms. McCullough, Ms. Bruce, Mr. Spevak and Mr. Angelloni, and were made and concealed knowing material facts were being hidden from BELP investors herein and intending to induce reliance and procure investment in EVERLOOP and BELP.

60.     But for the misrepresentations and the concealments outlined above, and the resultant belief that EVERLOOP had cutting edge technology driving user growth, such as EverText, the BELP investors herein would never have invested in BELP and EVERLOOP.

61.     The Defendants herein, either on their own or in concert with the EVERLOOP officers, employees or agents, made additional misrepresentations to the prospective investors as well as the current investors in the BELP Partnership.  Additional material misrepresentations included the financial status of EVERLOOP, and the existence of major investors that would be investing in the company.  These material misrepresentations and concealments were made to induce reliance and deceive the BELP investors into investing into BELP and EVERLOOP.

62.     Between 2011 and 2013, Defendants frequently represented that EVERLOOP closed or was on the verge of closing other partner opportunities with other large investors such a Predictive Edge and Brave Ventures.  These statements again were made to perpetuate the illusion that EVERLOOP was a thriving, cutting edge and sought-after company in order to goad additional BELP investors into investing additional sums in EVERLOOP.  However, it became apparent that the supposed co-investments from Brave Ventures, Predictive Edge, and others, never materialized and that co-investment by another major investor alongside BELP was apparently non-existent, contrary to the ARCHIPEL Defendants and EVERLOOP and DECESARE's ongoing assurances throughout this time period.

63.     These misrepresentations and concealment of information were perpetrated by GRAY, ARCHIPEL, BIM and the other ARCHIPEL Defendants, as well as EVERLOOP, DECESARE and by EVERLOOP's officers and directors, and were made knowing material facts were being concealed from BELP investors and intending to induce reliance and con BELP investors into investing and, later, continuing to invest in EVERLOOP. The Defendants herein, and DECESARE and EVERLOOP's officers and directors, knew that these statements were false, and knew they were made knowing material facts were being concealed from the possible BELP investors and intending to

23

induce reliance and con prospective BELP investors into investing and, later, continuing to invest in BELP and EVERLOOP.

64.     In or about April 2011, the ARCHIPEL Defendants herein touted that the investment interest in EVERLOOP had "heated up" and that EVERLOOP had "top investors looking to get in from Facebook" as well as the "founder of Expedia". DECESARE claimed that a former Facebook executive was looking to invest $2.15 million in EVERLOOP, a fact touted by GRAY and other agents, officers and/or employees of ARCHIPEL, BIM and the ARCHIPEL Defendants.

65.     On or about June 4, 2011, the ARCHIPEL Defendants and DECESARE represented that the upcoming Series A Round of investment in EVERLOOP was expected to raise $12.5 million and that she was being pressured to accept more investor money in a Series A round. DECESARE identified a number of highly visible investors as participants in the Series A financing round for EVERLOOP.  At that time it was released to the BELP investors that the expected influx of cash was expected as follows: BELP at $5 million; Predictive Edge at $5 million; Brave Ventures at $2 million; and the Seed Round Investors at $0.5 million.

66.     In or about September 2011, BELP received assurances from DECESARE and GRAY that funding by both Brave Ventures and Predictive Edge was also in process. In October 2011, GRAY, EVERLOOP, DECESARE and other ARCHIPEL agents, officers, and/or employees provided revised investor materials that identified Band of Angels, Envoi Ventures, and Wayne Goodrich as EVERLOOP investors.

67.     GRAY knew that, even though these statements were false and that no other real investment was anticipated, that the BELP investors would jump at the chance to be involved

with such other highly visible investors.  But for the perceived existence of at least one major co-investor, the BELP investors would not have invested in BELP and EVERLOOP.

68.     Between 2011 and 2013, GRAY, DECESARE and EVERLOOP also concealed from the BELP investors the true nature of EVERLOOP's financial position, maintained a campaign of misinformation regarding EVERLOOP's indebtedness, and concealed from BELP investors the fact that EVERLOOP was cash flow negative with mounting debts. This information was hidden from the BELP investors to perpetuate the illusion of EVERLOOP as a viable and thriving company and to con the BELP investors into continued investment in BELP and EVERLOOP.

69.     Except for a short time of several months that Andrew Russo was serving as acting CFO for EVERLOOP, at no time did GRAY or any of the ARCHIPEL Defendants, EVERLOOP, its founders or any of its officers or directors reveal or disclose to the BELP investors the true financial situation of EVERLOOP. To the contrary, GRAY distributed releases and materials that contained an impressive list of other supposed investors in EVERLOOP and consistently told BELP investors that any BELP money invested was being invested alongside other monies from the significant named investors. The officers and directors of GRAY, ARCHIPEL, BIM, and the other ARCHIPEL companies together with EVERLOOP, remained silent despite full knowledge of the truth and despite their known obligation and duty to protect the prospective investors in BELP. These misrepresentations and concealments of information were perpetrated by GRAY and the ARCHIPEL companies including BIM, ARCHIPEL, BENNINGTON, and the other companies controlled by GRAY and EDWARDS, together with DECESARE, acting on behalf of EVERLOOP, and based on GRAY,  ARCHIPEL,  BIM, and BENNINGTON and

their officers, employees and directors' concealments and active material misrepresentations about EVERLOOP's viability and financial position, BELP investors continued to infuse cash into BELP so that they unknowingly could put the money into a dying company.

70.     Upon information and belief, the money raised by GRAY from the BELP investors was already spent by the time it was received by EVERLOOP.  However, GRAY and the companies that he and EDWARDS controlled consistently told investors of the great viability and future that EVERLOOP had within the industry.

71.     The ARCHIPEL Defendants, together with DECESARE and EVERLOOP made repeated representations to BELP investors and prospective investors and EVERLOOP's other shareholders regarding EVERLOOP's supposed user numbers and engaged in an extensive campaign of misinformation and concealment to disguise data that would accurately reflect EVERLOOP's user numbers.

72.     These misrepresentations and concealments were likewise made to induce reliance and deceive possible and existing BELP investors and others into investing in EVERLOOP.  For example, in investor materials distributed by GRAY and the other ARCHIPEL Defendants, together with EVERLOOP and DECESARE represented that, as of May 2011, EVERLOOP had over 250,000 registered members and over 8,000 loops.  In January 2012, GRAY and the ARCHIPEL Defendants disseminated user growth figures for 2011 reflecting that EVERLOOP's user base had grown from approximately 5,000 in October 2010 to approximately 74,000 by December 2011. Later, GRAY and the ARCHIPEL Defendants falsely claimed EVERLOOP had upwards of 350,000 active users. These numbers were grossly exaggerated and untrue.

26

73.   GRAY, ARCHIPEL's officers, employees and Directors remained silent concerning the untruths being disseminated, and BIM, EDWARDS and the other ARCHIPEL companies likewise failed to advise the BELP investor group of the false nature of the information being disseminated.  Had the investors known of the lies and untrue statements concerning the numbers of users, they would not have invested the money into BELP and/or EVERLOOP. But for the false data provided by Defendants regarding EVERLOOP's user numbers continuous user growth, the BELP investors would not have invested and continue to invest in BELP and EVERLOOP throughout this time period.

74.   Also during the time period 2011-2013, the ARCHIPEL Defendants, including GRAY, made false and fraudulent statements concerning the people and organizations investing in EVERLOOP, again in an effort to hide the truth about the financial situation, and as part of a plan to entice more investment into BELP. Examples of such representations include relationships GRAY claimed EVERLOOP had with: Star Wars; AT&T; Verizon; Rogers Wireless; Sprint; the NFL, NHL and MLB.

75.   Additionally, in June 2011, GRAY circulated a press release stating that EVERLOOP had partnered with Pencils for Promise, a charity organization supported by Justin Bieber, Desmond Tutu, and the Harvard Business School, and that EVERLOOP was also launching "Evergive," an EVERLOOP program that supports non-profits benefitting kids around the world.

76.   By April 2012, investors were notified that the EVERLOOP-I-SAFE partnership had "fallen apart" and that EVERLOOP was looking for a new partner in the education market. In addition, investors were told that EVERLOOP had negotiated an agreement to bring on former NFL player and Syracuse resident Tim Green to facilitate

relationships for EVERLOOP with major professional sports leagues and/or teams. This was represented by Gray and Devin P. Stelljes as a major new channel for EVERLOOP to gain users and revenue. Investors are also told by Gray and Stelljes that Tim Green is an EVERLOOP investor and very interested in helping the company grow in order to enhance his own investment.

77.    In or about May 2012, GRAY reached out to Andrew Russo and Ryan McMahon and asked them to be advisors to ARCHIPEL CAPITAL. GRAY asked them for introductions to prospective investors in Syracuse. GRAY also offered to compensate them should they succeed in helping grow ARCHIPEL's investor base. At that time, ARCHIPEL was seeking investors in several partnerships, including BELP as well as similar vehicles dedicated to investing in the equity securities of a single private company. GRAY had become a Board observer at EVERLOOP and his partner GREG EDWARDS (a fellow General Partner in in all of ARCHIPEL's investment partnerships) had taken a seat on the Board of Directors of EVERLOOP.

78.    In or about the Summer of 2012, McMahon and Russo introduced GREG GRAY to a number of individuals in Syracuse. On several occasions, breakfast, lunch, or dinner meetings were organized for GRAY to present about ARCHIPEL and their various investment partnerships. On some of those occasions, GRAY also brought along CEOs from companies who were seeking investment, including DECESARE from EVERLOOP and was continuing to seek capital. A number of representations were made at those meetings, none of which turned out to be true or accurate. They represented the following:

    1) DECESARE was in advanced stage meetings with officials at Major

       League Baseball and the National Football League, while also speaking to

28

the owners and/or executives of several major teams in both leagues.

2) Prospective investors were told that deals with these organizations were imminent and would result in millions of new users as well as millions of dollars in revenue for EVERLOOP.

3) These resulting users and revenues were described as a catalyst for major companies like Facebook, Google, Yahoo, etc. who wish to acquire EVERLOOP for tens of millions of dollars, in order to expand their user base into the pre-teen market while complying with strict federal privacy laws related to personal information of children on the Internet.

4) Prospective investors were told about the millions of dollars DECESARE had personally invested in EVERLOOP and were told to watch an upcoming episode of NBC's The Secret Millionaire, which featured DECESARE talking about her wealth and showed her doing good works in a California community.

79.   Based on the representations by GRAY and DECESARE at these meetings and further upon the understanding that the meetings with Major League Baseball and the National Football League were occurring, a number of the Syracuse-based individuals who attended decided to invest in EVERLOOP through BELP.

80.   In or about October 2012, for the first time Andrew Russo was told of the fact that GRAY had been found responsible for a number of heinous acts against former clients and was issued a censure and a three-year suspension from the New York Stock Exchange. This was news to Russo and the Syracuse investors. Disturbed by this finding, Russo contacted the CFO of EVERLOOP directly and asked to see the latest financial statements for the company. Russo was sent the balance sheet for the end of Q3 2012. Based on

that document, it was immediately apparent that the company, only weeks after taking almost one million dollars of investment from Syracuse-based individuals through BELP, was deeply insolvent and that all of the money invested was already spent on past indebtedness.

81.     This was completely inconsistent with the representations that GRAY and DECESARE had just made weeks earlier to all of those individuals while inducing them to invest in EVERLOOP through BELP. Russo then reached out again to the EVERLOOP CFO as well as to EVERLOOP CEO DECESARE in order to understand how this had happened.  One thing that Russo learned was that DECESARE and EVERLOOP were aware of GRAY's disciplinary problems before the PPM was generated that was sponsored by EVERLOOP, ARCHIPEL (GRAY and EDWARDS), and BIM (GRAY and EDWARDS) and the attorneys, NIXON PEABODY, LLP.  Despite that knowledge of all of the above, nothing had been disclosed in the PPM's throughout this whole investment process.

82.     DECESARE blamed everything on GRAY, stating that she knew full well his disciplinary problems with the Exchange, and that she only moved forward with the partnership because of EDWARDS.  She said at that time that both GRAY and EDWARDS had proved difficult to work with and that they repeatedly had not come through on commitments to deliver EVERLOOP funding.  She felt that they may have been using some of the BELP money raised for other purposes unrelated to EVERLOOP.  She agreed to remain in close contact with the Syracuse investors, and to continue to find a solution to the economic condition at EVERLOOP.

83.     In or about November 2012, after weeks of dialogue with Russo and the Syracuse investor group, EVERLOOP's CFO resigned, and DECESARE asked Russo to

step in to be interim replacement.  Russo remained as interim CFO from mid-November 2012 through June 2013.

84.     Shortly thereafter, it was announced that former Mattel CEO Jim DeRose was going to join the company in an attempt to turn the economic crisis around.  At that time, Russo looked deeply into the company records in the position of CFO, only to find that both GRAY and DECESARE knew that EVERLOOP was in severe financial distress while representing that the company was on the brink of huge success while doing the Meets and Greets in Syracuse during the Summer of 2012.

85.     By way of further example, in May 2012, GRAY and DECESARE gave a presentation ostensibly touting EVERLOOP's position in the education market. The presentation was documented in a paper titled "EVERLOOP and the Education Market." The May 2012 paper confirmed the existence of the EVERLOOP — I-SAFE partnership (which did not exist). It further claimed that a significant number of major publishers were working with EVERLOOP, including Simon and Schuster, Harper Collins and Houghton Mifflin Harcourt, stating that EVERLOOP brought value to these publishing giants via a platform of eReaders. It was also claimed that McAfee, one of the largest Internet security companies in the world, had evaluated how EVERLOOP was working with companies like I-SAFE and the immense potential of these partnerships.  DECESARE stated that "[W]orking together, EVERLOOP, McAfee and Common Sense Media will bring Internet safety curriculum into schools and allow for continued programs." None of these partnerships existed and none were ongoing.

86.     At no time did GRAY, ARCHIPEL, BIM or BENNINGTON, or, any of its founders or any of its officers or directors reveal or disclose to the potential and actual BELP

investors that these partnerships did not actually exist or that the strength of the supposed

relationships was being exaggerated.  To the contrary, investor materials supplied to the

BELP investor groups by GRAY and others, together with DECESARE frequently cited

such relationships as an inducement to spur further investment in BELP and EVERLOOP.

The officers and directors of the GRAY-EDWARDS controlled companies remained silent

despite knowledge of the true state of endorsements and partnerships for EVERLOOP, and

despite having a duty to protect the Limited partnership members and the investors. These

misrepresentations and concealment of information were perpetrated by GRAY and the

GRAY-EDWARDS controlled companies along with DECESARE, acting on behalf of

EVERLOOP, and by the officers and directors of the ARCHIPEL companies and GRAY and

EDWARDS, together with EVERLOOP, as well as the Directors and owners of ARCHIPEL,

BIM, BENNINGTON, and BELP General Partner BIM.  Each, any and/or all concealed

knowledge of material facts that were being hidden from the investors and prospective

investors in BELP and intending to induce reliance and trigger the investors to put their

money into BELP and the investment in EVERLOOP.

87.    But for the fact that the investors believed that there was a high level of significant

partner support and relationships with significant known brands, the BELP investors would not

have invested and continued to invest in BELP and EVERLOOP.

88.    Between April 2011 and the end of 2012, the investors herein placed over

$2,590,000 into BELP for ultimate investment into EVERLOOP.  These investments were made

in reliance on all of the above described misrepresentations and concealments, and were allowed

to proceed by virtue of the failure to disclose material information, starting with the

misrepresentations concerning GRAY's background and experience, including his disciplinary

history with the New York Stock Exchange and FINRA, that led to a three-year suspension and censure for sales practice violations, and threats of bodily harm against customers. In deciding to invest in BELP and EVERLOOP, the investors reasonably relied upon the foregoing misrepresentations, concealments, and the failure to disclose material information and facts by GRAY, the ARCHIPEL Companies, EDWARDS, BIM, BENNINGTON, and others, as well as the officers and directors as set forth above.

89.     It subsequently became known to the investors that the above misrepresentations were made, that there was no agreement with I-SAFE, Inc., that none of the big named investors were really investing in the company or partnering with EVERLOOP, and that the financial condition of EVERLOOP was dismal, at best, and that the company was insolvent throughout the time period it was enticing new members to invest in the BELP partnership. It was also later learned that any money that ultimately went into EVERLOOP from BELP was spent to pay many of the prior bills and obligations of EVERLOOP, and not used for the stated purpose of growth and widening of its user base.

<u>THE FRAUDULENT EVERLOOP SETTLEMENT</u>

90.     On or about November 27, 2013, the BELP investors learned that EVERLOOP was intending to enter into a licensing agreement with B2BSocial that would grant B2BSocial a perpetual license in the EVERLOOP software. B2BSocial was a start-up company owned by one Bill Thompson, an investor in EVERLOOP. BIM, as General partner of BELP, objected to the deal with B2BSocial, and had NIXON PEABODY draft a complaint as against EVERLOOP and its officers and Board Members. Instead of going forward with the lawsuit, the parties agreed to mediate their alleged differences with a NAM professional mediator.

91.     This mediation resulted in a settlement for BELP, the full nature and extent of

which was never made known to the BELP investors.  In fact, rather than explaining to the investor group the nature of the settlement with EVERLOOP and its' officers and directors, GRAY and BIM, EDWARDS and BENNINGTON and the ARCHIPEL COMPANIES refused to allow the BELP limited partners to have any knowledge of the final settlement. A release was forwarded to each of the BELP partners, mandating confidentiality, warning that they were not to talk about the settlement with any of the other investors, and demanding that, if they wanted to obtain the proceeds of the settlement, that they were to sign a release to GRAY, BIM and the ARCHIPEL companies. It was subsequently disclosed by GRAY, that the claim against EVERLOOP was resolved for the sum of $300,000.  This was not true.

92.    This disclosure, and the demand for a release of the general partner and the individuals involved, was all done by GRAY and BIM in a fraudulent manner.  In fact, after expenses and fees, it is believed and therefore alleged that GRAY and BIM had received for BIM and the BELP partnership the net sum of $650,000. It was GRAY's plan to take $350,000 of the BELP settlement money, and not disclose that taking to the limited partners and investors. GRAY did exactly that, cheating the already defeated BELP investors yet again, this time to the tune of $350,000.

93.    In fact, GRAY took $350,000 of the EVERLOOP net settlement proceeds, and unlawfully transferred the money to another one of the ARCHIPEL entities, that was short of funds because of GRAY's illegal acts and takings.  As a result, GRAY fraudulently disclosed a fictitious settlement number, sent the terms of the fraudulent settlement in print to the members of the BELP limited partnership through the US mail, and through e-mail, while at the same time demanding a release for himself and all other ARCHIPEL Owners and Directors as well as anyone involved with the settlement of the action.

94.     These activities were false, fraudulent, and purposely done by GRAY, EDWARDS, BIM, and BENNINGTON.

95.     It is believed and therefore alleged that the total settlement with EVERLOOP that was negotiated by NIXON PEABODY was in the neighborhood of $1,000,000.

96.     The BELP investors were owed a full and complete accounting of the proceeds of the settlement, as well as a complete understanding as to the reasons for the settlement and the nature of the final resolution.  Instead of giving such information to the partnership, NIXON PEABODY drafted settlement documents for the use of the general partner, BIM, knowing (or reasonably should have known) that GRAY and BIM were going to again defraud the investors, take their money, and move the money into another vehicle that GRAY had organized for use by himself or use by other investors in a different group.

97.     At this time, upon information and belief, there has not been a full, complete and appropriate accounting or distribution of the proceeds that were agreed to with the EVERLOOP mediation.  Upon information and belief, BIM and GRAY and/or EDWARDS have retained money that was lawfully that of the investors and the Plaintiff in this action, and despite demand, appropriate payment has not been made to the investors.

98.     This is yet another act of fraud perpetrated on the BELP investors by GRAY, EDWARDS, BIM, and BENNINGTON.  By virtue of this fraudulent taking by BIM, GRAY, EDWARDS and others, the Plaintiff herein, both in his individual capacity and as a member of the class of investors in the BELP partnership have been damaged in a significant amount, not exceeding $1,000,000 plus interest, costs and attorney's fees, given the fraudulent nature of the settlement with EVERLOOP.

99.     Upon information and belief, the activities of GRAY and EDWARDS and BIM and

BENNINGTON, as well as the ARCHIPEL companies were done purposely, willfully, and in reckless disregard for the rights of the BELP investors.

100. Upon information and belief, GRAY, EDWARDS, and BIM have failed to make full, complete and appropriate payment of the money owed to the BELP investors.

101. Upon information and belief, BIM continues to hold some of the settlement money and there has not been a full, complete and appropriate distribution to those investors who felt there was something wrong with the documents that GRAY demanded be signed releasing the ARCHIPEL companies and the individuals involved in the settlement.

## SOCIAL MEDIA FUND FRAUD THE FAILURE TO DELIVER TWITTER SHARES

102. At least as early as September 2011, when GRAY transferred $50,000 from AGRIVIDA, LLC to EVERLOOP LP, GRAY has commingled and transferred money between the ARCHIPEL funds. GRAY and NIXON set up each ARCHIPEL Entity in roughly the same way. Investors bought interests in a limited partnership or limited liability company that supposedly invested the pooled funds entirely or primarily into a specific company or companies. BIM was the Managing Member or General Partner of each, with broad investment and operational discretion. GRAY is listed in the PPMs for the ARCHIPEL Entities as the contact for BIM on occasion with EDWARDS, GRAY, on behalf of BIM, signed all, or substantially all of the subscription agreements. GRAY opened separate bank accounts and brokerage accounts for each ARCHIPEL Entity, and has signatory authority on each bank account and trading authorization over each Entity's brokerage account. EDWARDS has signatory authority on five of the bank accounts—including two with nearly all of the ARCHIPEL Entities' current liquid assets.

103. Under the subscription agreements for each ARCHIPEL Entity, BIM is given the

power to "carry out any and all of the objects and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings that it may in its reasonable and good faith discretion deem necessary or advisable or incidental thereto." The PPMs for the ARCHIPEL Entities' offerings provide that BIM will "provide various advisory and management services to the Partnership," including "negotiating" and "structuring the Partnership's investment," "evaluating and monitoring the Partnership's investment," "monitoring the industry in which" the companies operate," and "providing periodic reports to Partnership investors" on the investments. BIM has the power for Social Media Fund LP and Late Stage Fund LP to choose the identity of the portfolio companies themselves, as well as the "sole discretion" to "determine to make distributions, whether cash, in kind, or a combination thereof, even if such securities have been registered for resale under the 1933 Act.".

104.    In exchange for its management and investment advisory services, the PPMs provide that BIM will be compensated with a management fee of 5% (paid up-front) of the total capital raised by each ARCHIPEL Entity, as well as a performance-based payment of 10% carried interest on the partnerships' profits. BIM also has the right to reserve investor money for expenses not anticipated to exceed 2.5% for AGRIVIDA LLC) and 5% (for the other ARCHIPEL Entities) of total capital raised.

105.    To date, Twitter is the only portfolio company that has undergone a positive liquidity event (having gone public in November 2013).  Social Media Fund LP, which invested solely in Twitter shares, is the only ARCHIPEL Entity that has given investors a positive return on their investment.  Bloom Energy LP and Late Stage Fund LP are open for investment and may accept additional investors, Lineagen LP and Agrivida LLC are no longer

accepting investors. Neither Lineagen Inc. nor Agrivida, Inc. has yet undergone a liquidity event so no investors have been redeemed.

106.    EVERLOOP, Inc. collapsed, and BELP received funds from a settlement as described above, but it is not now accepting new investor money.  However, the settlement money has not been fully and appropriately accounted for or distributed among the BELP investors.

SOCIAL MEDIA FUND, LP's PRE-IPO TWITTER SHARES FALL SHORT

107.    In or around May 2012, GRAY began to solicit investors for Social Media Fund LP, Social Media Fund LP issued a PPM describing its purpose as "raising capital, to target investments in portfolio companies in the social media industry's with "the first of its investments" to be common stock of Twitter "at a price not to exceed $26.00 per share."

108.    In September 2012, Social Media Fund LP agreed to purchase 25,000 Twitter shares for $25.50 per share, for a total of $637,500. By this point, although GRAY had raised enough investor money in the fund to cover this purchase, he had transferred more than half out of the partnership's bank account to other ARCHIPEL Entities.  For example, on June 27, 2012, GRAY transferred $150,000 from Social Media Fund LP to Agrivida LLC, which he then used to invest in Agrivida Inc. on the same day, and on August 1, 2012, he transferred another $200,000 to EVERLOOP LP, which he then used to invest in EVERLOOP Inc. on the same day.

109.    Because more than half of the Social Media Fund LP's funds had been transferred out of the partnership's bank account, GRAY paid for the September 2012 pre-IPO Twitter shares with $207,500.00 taken from other ARCHIPEL Entities' bank accounts. For example, on September 5, 2012, Gray took $25,000 from Agrivida LLC, $55,000 from Bloom Energy LP,

$7,500 from Lineogen LP, and $120,000 from EVERLOOP, LP and transferred those monies to Social Media Fund LP's account.

110.    After learning that GRAY had bought Twitter shares at $25.50, certain investors complained that they had expected the price per share of Twitter to be lower.  GRAY responded in November 2012 by having Social Media Fund LP issue "Supplement No. 1" to the PPM.  The Supplemental PPM stated that the fund "intend[ed] to use proceeds from the continued fundraising to acquire additional shares of stock of Twitter with a targeted price per share of any future purchases not in excess of $20 per share." In April 2013, Social Media Fund LP issued an Amended and Restated" PPM, which reiterated the $20.00 targeted acquisition price.

111.    In August 2013, Social Media Fund LP purchased an additional 55,000 shares of Twitter common stock for $22.50 per share, for a total of $1,237,500. This purchase was funded by an investor which had invested $1,268,437.50 in Social Media Fund LP one day before the fund's Twitter purchase.

112.    Social Media Fund LP made no additional purchases of Twitter shares before Twitter's IPO on November 6, 2013.  In sum, between June 2012 and November 2013, Social Media Fund LP raised $5,240,092.49 from investors, promising to acquire approximately 230,000 shares, but it only had purchased 80,000 pre-IPO shares for $1,875,000.00, at an average cost of $23.44 per share.

113.    The pre-IPO Twitter shares the Social Media Fund LP purchased were restricted and could not be sold to the general public until six months after the IPO.  Thus, GRAY knew that Social Media Fund LP investors would expect either a distribution of the Twitter shares themselves or the cash equivalent of their post-IPO value by May 2014, or six months after

Twitter's IPO, but by May 2014, Social Media Fund LP's bank account held less than $100,000, and GRAY had only purchased 80,000 of the expected 230,000 Twitter shares in the pre-IPO period. Thus, GRAY knew that he needed either an additional 150,000 shares of Twitter or $4,777,500, the value the Twitter shares would have held for fund investors if the fund actually held those shares.

114.    As he was facing these investor expectations, in April 2014, GRAY began to solicit investments in a new partnership, Late Stage Fund L.P.  He told potential investors he had a $5 million to $10 million allocation in shares of Uber.  By the end of May 2014—as GRAY was under increasing pressure from Social Media Fund LP investors to give them their promised returns—he sweetened the deal for prospective Late Stage Fund LP investors, offering one prospective investor, William McEssy a nearly riskless investment. McEssy had invested $1,865,035.00 in other ARCHIPEL Entities, including Social Media Fund LP, GRAY now proposed that McEssy invest $5 million into the Late Stage Fund and he, GRAY, would find another investor to buy him out once UBER's next (and doubled) pre-IPO valuation was set. GRAY pressed McEssy to move quickly (as he had to in order to satisfy the Twitter investors.), and told McEssy he had to act by June 20, 2014.

115.    Based on these and other favorable terms, on June 10, 2014, McEssy transferred $5,000,000 to the Late Stage Fund LP bank account. Also in June 2014, GRAY received the $650,000 settlement in connection with the claim that EVERLOOP LP had brought against EVERLOOP, Inc. As he was waiting to receive funds from McEssy and the EVERLOOP settlement of which he was to raid $350,000 from the BELP investors, GRAY assured Social Media Fund LP investors repeatedly that a distribution of their Twitter shares was forthcoming, blaming transfer agent issues for the delay.

116.     On June 19, 2014, GRAY emailed certain Social Media Fund LP investors to assure them that the transfer agent issues had been resolved and that the shares had been delayed because of a new account opening delay of the brokerage company he was using. This was not true.  He told the Twitter investors that the shares would be transferred "next week".  These statements were false, as GRAY knew. At that time, GRAY had only 1,798 pre-IPO Twitter shares, which he ultimately took for himself months later, in November 2014. Instead, upon opening the account with a new Brokerage Firm GRAY, in late June, took nearly all of McEssy's $5,000,000 Late Stage Fund LP investment, as well as approximately $350,000 from the EVERLOOP settlement, and transferred it to Social Media Fund, LP investors. In order to give them their expected return on investment. This included a $2,129,366 cash payment that went directly from the Late Stage Fund LP bank account to another investor that had invested $1,268,437.50 in Social Media Fund L.P. and $2,449,500 that indirectly went back to McEssy, who had invested $1,200,000 in Social Media Fund LP.

117.     The redemption payment to McEssy occurred in two steps. First, in late June, GRAY transferred $1,185,000.00 to McEssy from the Social Media Fund LP account (using funds that GRAY had transferred into that account from McEssy's own investment in the Late Stage Fund LP). GRAY then purchased 30,000 shares of Twitter at $39.50 in June 2014, sold the shares at $42.60 in July 2014, receiving $1,277,963.80. He gave a cash payment of $1,264,500.00 to McEssy, which supposedly was the second half of his expected return. GRAY also bought approximately 30,000 shares of Twitter on the open market for $37.70 to $40.83 per share, and then days later distributed the shares to various Social Media Fund LP investors, In total, GRAY used $2,390,951.10 of Late Stage Fund LP's proceeds to purchase post-IPO Twitter shares to distribute to Social Media Fund LP investors.

118.   Certain investors in Social Medial Fund LP complained that they had still received fewer Twitter shares or less money than expected. On August 1, 2014, Gray told investors that he would distribute on a pro rata basis the remaining $136,657.04 that his expense summary revealed as still owing to investors.

119.   As of August 11, 2014, however, Social Media. Fund LP had only $50,388.25 in its bank account. To cover that shortfall, on August 11, 2014. GRAY moved $100,000 from the Lineagen LP bank account to the Social Media Fund LP bank account and, from August 15 to October 1, 2014, GRAY distributed approximately $135,000 to Social Media Fund LP investors.

120.   On June 12, 2014, GRAY and Investor A executed a letter agreement for McEssy's Late Stage Fund LP investment of $5 million. The agreement gave the fund 21 days to acquire "at least 142,857 shares of UBER at $25.00 per share price" which "represents an approximate $6 billion valuation for UBER."

121.   Afterwards, McEssy's business manager repeatedly asked GRAY for documentation that Late Stage Fund LP owned Uber shares. On or about August 8, 2014, GRAY ultimately sent the business manager the "proof." GRAY delivered a fabricated document, claiming that the document was "the executed [stock-transfer agreements] by 1) UBER, 2) the seller, and ARCHIPEL/GP." The document purported to reflect that an individual, Thaing Po "sells, assigns and transfers 175,438 shares of "Uber Technology Inc." to the Late Stage Fund LP, but no such stock transfer agreement had ever been executed by the seller to sell Uber shares.  Instead, GRAY (or someone acting by his direction) copied and pasted the Seller's signatures from an earlier, legitimate stock-transfer agreement by which the Seller had transferred shares he owned in an entirely different entity, Bloom Energy Corp., that he had

42

executed on or about November 8, 2013, in connection with a purchase of Bloom Energy Corp. stock by Bloom Energy LP, a separate ARCHIPEL Entity. Thaing Po, the purported seller, has never owned or sold any Uber shares nor signed any documents relating to a sale of Uber shares.

122.    The stock transfer agreement purporting to evidence a purchase of Uber stock was a sham, a fact GRAY knew or was reckless in not knowing, and no Uber shares were ever acquired by Late Stage Fund LP as GRAY has recently acknowledged in testimony before the SEC. While GRAY now claims that McEssy's "allocation" was moved into Lyft, Inc. (an Uber competitor) and other well-known pre-IPO stocks, he had not told McEssy that no Uber shares were bought by the Late Stage Fund LP as recently as December 2014. In addition, as of February 20, 2015, Late Stage Fund LP bank records show a balance of only $481,184.05.

123.    GRAY had made an agreement with the Plaintiffs in this action to deliver 55,000 shares of Twitter stock to them, and gave a written confirmation to Andrew Russo with regard to the same.  But at the end of all of the illegal maneuverings and passing of money from one entity to another, the fund was still short a substantial amount of shares, and GRAY and the fund never delivered the whole 55,000 shares.  When everything was completed and the Fund depleted, the Russo (Prufrock) investors were still short 7,961 shares of Twitter stock.

124.    Neither GRAY, EDWARDS, ARCHIPEL, BIM, nor the Social Media Fund, LP has ever made up the difference.

125.    Upon information and belief, the confirmation that GRAY gave to the Prufrock investors was a sham, as GRAY never had any intention to deliver the full amount of shares. GRAY created the confirmation on behalf of BIM and the ARCHIPEL—Social Media Fund, LP.  At no time did his partner, EDWARDS stop or control his actions, even though GRAY was in constant contact with EDWARDS, and he was aware of the shortfall of the Twitter

stock and the shorted delivery.

126.     The first knowledge that the Prufrock investors got that there was going to be a

shortfall was when the K-1's were delivered to them in April 2014.  At that time it was realized,

for the first time, that GRAY had shorted them on the number of shares.

127.     In all, GRAY's conduct, both in his individual capacity and as a fiduciary for the

ARCHIPEL Investors has been purposeful, reckless and intentional.  GRAY was assisted in his

scams and his Ponzi-type arrangement with the help of ARCHIPEL, BIM, EDWARDS, and

BENNINGTON.  Without the help and assistance of each of the Defendants herein, GRAY would

not have been able to get the ARCHIPEL investors to consistently invest in the ARCHIPEL

partnerships and LLC's.  Without the false misrepresentations in the BIO and in the RISK

sections of the individual PPM's, and the serious and material omissions and concealments

concerning GRAY's checkered past, and disciplinary proceedings against him, including the

censure and the surrender of his license pursuant to the Bar initiated by the NYSE, the Plaintiffs

herein would not have invested in the ARCHIPEL Funds, which have now been the subject of a

Ponzi Scheme deliberately conceived by GRAY to fraudulently injure the investing Plaintiffs

herein.

128.     Because of the conduct of GRAY and the other ARCHIPEL Defendants, the

Plaintiffs both in their individual capacity, and as a class of others similarly situated, have lost

significant monies that were invested into the ARCHIPEL investment vehicles. And to the extent

that other monies of the investors continue to be held by the ARCHIPEL funds, those monies are

at risk to be lost, and/or have been already lost by the activities of GRAY, EDWARDS, BIM,

ARCHIPEL.

129.     Instead, upon opening the account with Brokerage Firm X, GRAY, in late June,

took nearly all of the investor A's $5,000,000 Late Stage Fund LP investment, as well as approximately $350,000 from the EVERLOOP settlement, and transferred it to Social Media Fund LP investors to give them their expected return on investment. This included a $129,366 cash payment that went directly for the Late Stage Fund LP bank account to Investor B that had invested $1,268,437.50 in Social Media Fund L.P. and $2,449,500 that indirectly went back to Investor A who had invested $1,200,000 in Social Media Fund LP.

130.    The redemption payment to Investor A occurred in two steps. First, in late June, Gray transferred $1,185,000.00 to Investor A from the Social Media Fund LP account (using funds that Gray had transferred into that account from Investor A's own investment in the Late Stage Fund LP). Gray then purchased 30,000 shares of Twitter at $39.50 in June 2014, sold the shares at $42.60 in July 2014, receiving $1,277,963.80, and gave a cash payment of $1,264,500.00 to Investor A, which supposedly was the second half of his expected return.

131.    Upon information and belief, the amount in controversy exceeds the monetary threshold of all lower courts.

## CLASS REPRESENTATIVE CLAIMS

132.    Plaintiffs hereby repeat and re-allege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

133.    Plaintiffs Amerio and Goldberg individually entrusted monies to GRAY and the other Defendants for investment on their behalf based on materially false and misleading information disseminated by the Defendants herein, to the effect that GRAY's entities were legitimate enterprises engaged in the lawful brokerage and sale of investment securities, when in truth GRAY's companies, and the other Defendants was a fraudulent Ponzi Scheme predicated upon the satisfaction of interest and divided commitments through the distribution of its investor

principal and others who profited from the wrongdoing.

134.   Plaintiff Goldberg first entrusted monies to Defendants in or about September, 2011, ostensibly for the establishment and investment into the EVERLOOP LP investment.  At that time, he understood that the money would be supervised and controlled by GRAY and BIM, for the sole purpose of investing the money in what was touted to be an up-and-coming software company that would have as its market the Tweens generation.  At the time that Plaintiff Goldberg first invested funds with GRAY and the Defendants, the Defendant GRAY acting through BIM, and the other ARCHIPEL companies, represented that BIM, and the BENNINGTON EVERLOOP PARTNERSHIP, LP was a legitimate enterprise operating as a lawful company, when in truth, the Defendants GRAY and EDWARDS' companies  were set up to be a fraudulent scheme, which could remain solvent only by receiving new influxes of money from investors to pay bills that were hopelessly overdue at EVERLOOP, Inc.

135.   Upon information and belief, when the Defendant GRAY, acting on behalf of the Defendant companies, misrepresented the nature of his background, his disciplinary actions against him, and the true nature of the economic situation of EVERLOOP, Inc., he thereby induced Plaintiffs and the members of the Class to invest monies with the ARCHIPEL companies, so as to conceal the real nature of the Ponzi Scheme that the Defendant GRAY was setting up.

136.   Upon information and belief, Plaintiffs naturally, reasonably, and justifiably relied upon the Defendants' misrepresentations concerning the nature of EVERLOOP, Inc., the background experience and ability to act fairly and aboveboard by GRAY, and otherwise believed the representations that were made by GRAY and the EVERLOOP individuals, acting on both their own behalves and on behalf of the ARCHIPEL companies, including BIM, BENNINGTON, and others, to invest Plaintiffs' monies with the Defendants.

137.    Upon information and belief, Plaintiff Goldberg later entrusted additional monies to GRAY and the ARCHIPEL companies and the other Defendants, for establishment of additional investments into EVERLOOP, and some of the other investments of the Defendants' ARCHIPEL companies, all of which were supervised and controlled by GRAY, EDWARDS, ARCHIPEL, BIM, BENNINGTON, and their agents, officers, employees and others.

138.    Upon information and belief, at the aforesaid time and place, Plaintiff Goldberg relied upon the representations that were made in the PPM that was produced by NIXON PEABODY, LLP, which were based upon and contained false and materially misleading statements.

139.    At all relevant times, during the 2012–2013 time period, based on the claims made by the EVERLOOP agents, officers and/or employees, and GRAY, and ARCHIPEL, both together, and on behalf of the relevant ARCHIPEL companies involved, including BIM, BENNINGTON, and EDWARDS, invested further monies in EVERLOOP, Inc., and the other entities formed by GRAY, and touted to be wonderful vehicles for investment.

140.    Upon information and belief, the statements made by GRAY and the EVERLOOP agents, officers and/or employees and directors, including the CEO of EVERLOOP, Inc., and the misrepresentations and concealments of both GRAY, EDWARDS, BENNINGTON and  BIM were all part of an integral scheme on behalf of the Defendants' overall scheme to defraud, insofar as they got investors to invest in the ARCHIPEL limited partnerships that were being formed by GRAY and EDWARDS to entice investments on behalf of the Plaintiffs herein individually, and all persons similarly situated that invested into the same companies, and for the same reasons that Plaintiffs have so invested.

## CLASS ACTION ALLEGATIONS

47

141.    Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following:

a.     All persons and entities who purchased securities sold by or through any of the Defendants named in this matter, including GRAY, EDWARDS, BIM, BENNINGTON, and any of the ARCHIPEL Defendants, from as early as the formation of the BENNINGTON – EVERLOOP, LP, and the remaining ARCHIPEL companies that were placed into business subsequent to that at the request of GRAY and EDWARDS, by and through the activities of NIXON PEABODY, LLP, as the lawyer for said companies, from the early formation of the BENNINGTON EVERLOOP, LP in 2011, through July, 2014 inclusive (the "Class").

b.     Excluded from the Class are: (1) all persons or entities whose claims against Defendants with respect to the securities purchased and investment by that person or entity had been finally adjudicated, individually or on a class-wide basis, in litigation or arbitration, before any court or arbitration tribunal; and, (2) all persons or entities who have entered into valid releases with the Defendants covering all of the wrongs alleged in this complaint.  To the extent that any person has not had all of his or her claims with respect to the securities purchased and investment and finally adjudicated or finally released, the Class includes said person(s), but only to the extent of un-adjudicated and/or unreleased claims arising from the damages suffered as a result of an investment in any of the investments.

c.     Also excluded from the Class are Defendants, members of the immediate family of any Defendant, and their legal representatives, heirs, successors or assigns.

d.     The Class satisfies the requirements of Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

e.     *Numerosity*.  During the Class period, numerous different securities were

sold to the Plaintiffs herein.  The number of the Class members is estimated to be at most, 140 people.

       f.    *Typicality*.  The losses to the Plaintiffs were caused by the same events and the courses of conduct that give rise to the claims of the other members of the Class are identical.

       g.    *Common Questions*.  Among the questions of law and fact common to this Class are:  (a) whether the Defendants violated the Exchange Act; (b) whether the Defendants violated RICO, Sections 1962(a), 1962(c) and 1962(d); (c) whether the Defendants fraudulently concealed the corrupt practices outlined in this Second Amended Complaint from the Class; (d) whether the Defendants have breached their fiduciary duties to the Class; (e) whether Defendants are liable for common law fraud for misrepresentations made to the Class; (f) whether the Defendants are guilty of misrepresentations and concealment with regard to the PPMs that were delivered to each of the Plaintiffs for purposes of inducement of investment; (g) whether the Defendants engaged in a pattern or practice to tout their securities, regardless of the suitability of such investments, including whether such investment caused over concentration in any of the portfolios of the Plaintiffs and the Class; (h) whether the Defendants conspired amongst themselves, either individually, jointly, severally, or together, to commit any of the wrongs in violations alleged in this Second Amended Complaint; and (i) whether the members of the Class have sustained damages as a result of the Defendants' conduct, and if so, the proper measure of damages.

       h.    *Adequate Representation*.  Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained experienced counsel qualified in complex and commercial litigation and class actions, and such counsel are competent to assert the Class' interest.

i.     *Superiority*.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Individual damages to any one investor may be relatively small, making the expense of non-class litigation prohibitive or impracticable for Class members.  In light of the disclosures of the SEC investigation, the New York Stock Exchange disciplinary proceedings of 2008 and 2009, the pending criminal charges against the Defendant GRAY, additional lawsuits are likely to be filed.  An overall resolution, fairly apportioned among Plaintiffs and Class members as against all Defendants, is preferable to the result of inconsistent litigation dealing with the individual investors.

**FIRST CLAIM FOR RELIEF**
**(Violations of §10(b) the Exchange Act and Rule 10b-5)**

**A.**     **Violations of §10(b) of the Exchange Act and Rule 10b-5 in relation to the Contents of Private Placement Memorandums and Bennington-Everloop, LP.**

142.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.  As a result of this Court's rulings in the August 2016 Order, this claim is asserted against Defendants Gray, Edwards and Bennington.  ECF No. 81 at 10-15 (discussing Claim 1 in Plaintiff Goldberg's Amended Complaint).

143.     As set forth in the factual allegations above and herein, the Defendants, in person and through the use of mail and the means and instrumentalities of interstate commerce, fraudulently induced Plaintiffs and Class members to purchase securities being marketed by GRAY, EDWARDS and the ARCHIPEL entities herein by and through the creation, naming and use of a limited partnership structure intended to mislead potential investors by concealing the quality and qualifications of those involved in the management of said limited partnership, specifically Defendant GRAY, as well as through the  use of materially false and misleading PPM's and other documents, statements, sales materials, and oral presentations.

50

144.    The Defendants, directly and through their agents, knowingly transmitted and disseminated to Plaintiffs and Class members materially false and misleading statements, as set forth above, describing and recommending the purchase of securities and investment interests that were eventually purchased by Plaintiffs and the Class.

145.    To start, Defendant GRAY had disciplinary issues with FINRA and the New York Stock Exchange beginning in 2007, when he was accused, and ultimately found guilty, of making unauthorized trades on customer's accounts, and, when challenged on this illegal use, threatening the customers with bodily harm and otherwise harassing them, and in two cases actually threatening to kill the customers.

146.    Having been found guilty of these charges, GRAY was censured by the NYSE Hearing Board and barred from trading securities for at least three years.  The sanctions against GRAY were upheld by the Securities and Exchange Commission on appeal, where the NYSE argued that "Gray's readiness to abuse his customers and his continuing reluctance to acknowledge his misconduct would support higher sanction-consistent with [NYSE and NASD precedent] – even Gray's permanent exclusion from the securities industry."

147.    GRAY surrendered his license in February 2008 and remains unlicensed to the present day.

148.    Upon Information and belief, from 2006 until GRAY's arrest in March 2015, GRAY has spoken with his business partner, Defendant EDWARDS, approximately three times per week, every week, about every deal, every offering, and any developments in a particular offering that they have open or hope to open at any given time.

149.    Upon information and belief, as a result of EDWARDS' close business relationship and frequent correspondence with GRAY, Defendant EDWARDS has been fully aware of

GRAY's professional disciplinary history of censure and loss of license since 2007 or 2008.

150.    Defendants EDWARDS and GRAY first discovered EVERLOOP and its CEO HILARY DECESARE when EDWARDS attended, and was very impressed by, a presentation about EVERLOOP given by DECESARE in or about January 2011 in Silicon Valley, California, approximately three years after GRAY was censured and lost his license to trade securities.

151.    At this meeting, EDWARDS introduced himself to DECESARE and advised her that he wanted to personally invest in EVERLOOP's seed round, which, upon information and belief, EDWARDS did.  At this meeting, EDWARDS also spoke with DECESARE about and/or introduced DESESARE to his partner, Defendant GRAY, and discussed the possibility of having ARCHIPEL put together an investment vehicle for the purposes of soliciting money to be invested in EVERLOOP through a private placement, the plan being that GRAY and EDWARDS, as owners of ARCHIPEL, would charge an upfront management fee on investments in the ARCHIPEL investment vehicle, and also make money on carried interest on profits.

152.    Upon information and belief, Defendant GRAY also personally invested $50,000 in EVERLOOP.

153.    Upon information and belief, EDWARDS, in return for his investment in EVERLOOP, and because of his status in the business and investment worlds, was given a seat on EVERLOOP's Board of Directors.  GRAY also was invited by DECESARE to attend EVERLOOP's Board meetings as a Board Observer.

154.    In or about April 2011, EVERLOOP CEO DECESARE contacted EDWARDS with concerns about GRAY's disciplinary history as it pertained to his involvement with the soliciting of investments for EVERLOOP through the ARCHIPEL entities.

155.    In order to allay DECESARE's concerns in this regard and allow for GRAY's

continued involvement in the solicitation of investments in EVERLOOP, EDWARDS and GRAY decided to form and/or use Defendant BENNINGTON INVESTMENT MANAGEMENT, INC., a Canadian company wholly owned by EDWARDS and operated only by EDWARDS and GRAY, as the namesake and as a partner of defendant BIM, which would ultimately be formed to be the general partner, along with ARCHIPEL, of the EVERLOOP investment vehicle sponsored by GRAY and EDWARDS: BENNINGTON-EVERLOOP, LP ("BELP").

156.    By naming BELP and BIM after EDWARDS' BENNINGTON INVESTMENT MANAGEMENT, INC. (instead of using ARCHIPEL in the name of the LP as GRAY and EDWARDS did for every other BIM/BENNINGTON/ARCHIPEL investment vehicle (i.e, Archipel Capital-Bloom Energy, LP, Archipel Capital-Lineagen, LP,  Archipel Capital- Agrivida, LP, Archipel Capital-Social Media Fund, LP and Archipel Capital-Late Stage Fund, LP), EDWARDS, and GRAY intentionally structured the EVERLOOP investment vehicle (BELP) to achieve a "separation" of GRAY from BELP due to the legitimate concerns of the EVERLOOP CEO regarding GRAY's disciplinary history of censure and loss of license, and to align BELP more closely with EDWARDS and BENNINGTON because of EDWARD'S well-regarded credentials, including the fact that he carried the prestigious designation of Chartered Financial Analyst ("CFA"); a fact that GRAY repeatedly called attention to in his in-person and written correspondence with prospective investors he was trying to solicit for investment in BELP.

157.    In May 2011, Defendants EDWARDS, GRAY, KOEPPEL and NIXON PEABODY formed and/or caused to be formed BIM MANAGEMENT, LP and BENNINGTON-EVERLOOP, LP ("BELP").

158.    Also in May 2011, Defendants EDWARDS and GRAY prepared and/or caused to be prepared the BELP private placement memorandum ("PPM"), which would be disseminated

to prospective investors in order to induce them to invest in BELP.

159.    Significantly, Defendants GRAY and EDWARDS, working in concert with each other, intentionally omitted to mention GRAY's disciplinary history of censure and loss of license in the BELP PPM even though this information is required to be set forth in the PPM's Management section (which contains the professional biographies of Edwards, Gray and Devin Stelljes) and/or Risk Factors section and thereby disclosed to prospective investors.  EDWARDS and GRAY proceeded to make the same omissions in the PPM's for Archipel's other limited partnership investment vehicles, i.e., Bloom, Lineagen, Agrivida, and Twitter (Social Media Fund, LP).

160.    Defendants GRAY and EDWARDS and each of them, acting in concert with each other to structure BELP and the other ARCHIPEL limited partnerships at issue in this action and prepare PPMs for the same, intentionally omitted GRAY's disciplinary history in all of the PPM's they prepared, sponsored and disseminated to prospective BELP investors and every other ARCHIPEL private-placement, limited partnership offering at issue in this action (except for Archipel Capital-Late Stage Fund, LP). GRAY and EDWARDS intentionally omitted this information with the full knowledge that, at the very least, the EVERLOOP CEO herself considered Gray's disciplinary history to be not only material, but a serious cause for concern with regard to GRAY's participation in the solicitation and management of investments through private-placement limited partnership offerings.

161.    In addition, despite specific knowledge of GRAY's disciplinary history and the EVERLOOP CEO's concern regarding GRAY's involvement in EVERLOOP and soliciting investments for the company, Defendants GRAY, EDWARDS, ARCHIPEL, BIM, and BENNINGTON proceeded to make the false statement in the Management section of the PPMs

that GRAY "is a registered investment advisor for NASD Licenses: Series 6, 7, 63, 65." This statement regarding GRAY's registration and licensure was and is false; Defendants GRAY and EDWARDS had specific knowledge of the details of GRAY's disciplinary history, and thus knew these statements were false and misleading when they included them in the PPM's and repeatedly disseminated them to prospective investors in 2011, 2012, 2013, and 2014, and DEFENDANTS GRAY and EDWARDS intentionally and/or recklessly made these false statements in the PPM's in order to conceal GRAY's disciplinary history from prospective investors and induce them to invest in the various ARCHIPEL entity funds, including BELP.

162.    Because EDWARDS and GRAY and each of them, had specific knowledge of GRAY's disciplinary history, intentionally structured and named BELP after BENNINGTON instead of ARCHIPEL, omitted GRAY's disciplinary history from the PPM's, and lied about GRAY's licensure in the PPM's, and did this all because they knew that the EVERLOOP CEO had serious concerns about GRAY's disciplinary history and that the revelations of GRAY's history would compromise their ability to solicit money from investors, such misstatements and omissions of material fact were specifically, intentionally and fraudulently made in the PPM's by, and are attributable to, EDWARDS, GRAY, ARCHIPEL, BIM and BENNINGTON and each of them, and made by each of said Defendants in order to defraud investors through the concealment of material, negative information regarding GRAY's career in the securities industry.

163.    In May 2011, Defendants GRAY and EDWARDS began soliciting investments in BELP from potential investors with a view to making money from management fees and carried interest via their respective ownership interests in ARCHIPEL, BIM and BENNINGTON, and also supporting and growing their own direct investments in EVERLOOP.

164.   On or about August 29, 2011, in furtherance of Defendants GRAY and EDWARDS' plan to make money from management fees and carried interest on profits by investments in BELP, GRAY and EDWARDS, through ARCHIPEL and as owners and control members of ARCHIPEL, BIM, BENNINGTON and BELP, caused written correspondence to be disseminated to Plaintiffs and Class members in which they stated that ARCHIPEL, (meaning GRAY and EDWARDS as owners) had its monthly meeting with EVERLOOP and its Executive team, including CEO DECESARE, and also specifically, intentionally, and repeatedly made false statements regarding, among other things, EVERLOOP'S financial health and its "established" partnerships, all in order to induce investment in BELP.

165.   Among these misrepresentations made by GRAY, EDWARDS and ARCHIPEL was that EVERLOOP had key strategic partnerships with a company called I-Safe, which was well known to be an industry leader in online user safety for internet use in schools.  GRAY, EDWARDS and ARCHIPEL also falsely represented to Plaintiffs and Class members that EVERLOOP had partnered with the White House, Mad Science, National Geographic, Fisher Price, Mattel Toys and the Girl Scouts of America, among others, and also had strategic investors such as the Walton family (Wal-Mart), the Justin Beiber Foundation, Nixon Peabody, LLP, Russell Simmons, Ecko Industries, Facebook Executives, and Expedia Executives, among others. Upon information and belief, none of these representations were true.

166.   With regard to the supposed I-Safe partnership, GRAY, EDWARDS and the ARCHIPEL DEFENDANTS falsely represented to Plaintiffs and Class members that through the Everloop – I-Safe partnership, the Everloop platform had already been installed in 56,000 schools and that I-Safe and Everloop were in discussions to add an additional 50,000 more schools for a total of 106,000 schools and associated users by the second quarter of 2012.

167.    GRAY knowingly made the false representations about the existence and benefits of the I-Safe partnership at a series of in-person meetings and phone conversations with potential BELP investors in Syracuse in May 2011.

168.    On September 22, 2011, GRAY, together with ARCHIPEL employee Devin Stelljes, sent additional correspondence to Plaintiffs and Class members touting the partnership with I-safe and stating that "The I-safe partnership is critical in that I-Safe is a non-profit and industry leader in e-education and is in 250,000 schools.  This exclusive partnership acts as Everloop's sales force and allows them to continue to get into more and more schools without devoting any costs to a tradition [sic] sales force." This September 22, 2011, correspondence states further that "Everloop is already considering another 50,000 schools."

169.    In January 2012, the ARCHIPEL Defendants and DECESARE and EVERLOOP disseminated user growth figures for 2011 reflecting that EVERLOOP's user base had grown from approximately 5,000 in October 2010, to approximately 74,000 by December 2011.  The dramatic spike in user numbers was attributed to the supposed launch of EverText in or about October 2011.  Upon information and belief, as Andrew Russo discovered when he was recruited to be interim CFO of Everloop, the EverText product never actually existed beyond a development stage and could not have dramatically impacted EVERLOOP user growth as GRAY, the ARCHIPEL Defendants, EVERLOOP and DECESARE, and each of them, reported to investors in 2012.

170.    The ARCHIPEL Defendants, DECESARE and EVERLOOP's officers and directors remained silent regarding the true state of this technology despite full knowledge of the truth and an obligation and duty to protect the company and its shareholders. The same was true for the ARCHIPEL Defendants. These misrepresentations and concealments

of information were perpetrated by GRAY, the ARCHIPEL Defendants, and DECESARE acting on behalf of EVERLOOP, and were made with the knowledge that material facts were being hidden from BELP investors herein and intending to induce reliance and procure investment in EVERLOOP and BELP.

171.   In February 2012, GRAY, BIM and agents, officers, and/or employees of BIM and ARCHIPEL, together with DECESARE, told BELP investors that I-SAFE was beta testing in schools in Florida and Nebraska. Upon information and belief, that statement was false and misleading at the time it was made as both GRAY and DECESARE were already aware that any potential partnership between I-SAFE and EVERLOOP had fallen through long before.  If GRAY did not know that, then he and EDWARDS were in woeful breach of their fiduciary duty as Board Members and as sponsors and control people for the BELP partnership and the investors in BELP.

172.   These statements, particularly with regard to I-Safe, were entirely false and misleading and, as represented by GRAY and the ARCHIPEL defendants, central to the decision of Plaintiffs and Class members to invest in BELP.  As Plaintiffs and Class members learned on October 29, 2013, after becoming suspicious of GRAY and reaching out to the CEO of I-Safe directly, there was never any partnership between Everloop and I-Safe, Inc. (which was the I-Safe that was known to be the industry leader in e-education and represented to be in partnership with Everloop) and the Everloop platform was not, and never had been, in 56,000 schools, as repeatedly represented by GRAY via e-mail correspondence and in-person meetings with prospective and actual BELP investors.  Given their insider status as an Everloop Board member and Board Observer and their relationship with Everloop CEO DeCesare, GRAY and EDWARDS, along with the ARCHIPEL defendants, knew that there was never such a

partnership between I-Safe and Everloop every time they made these representations to Plaintiffs and Class members, and these misrepresentations were intentionally made by GRAY and EDWARDS in order to induce continued investment in BELP despite the fact that Everloop was deeply insolvent.

173.    Upon information and belief, GRAY and EDWARDS attended Everloop Board meetings and also met with the Everloop Executive team on a monthly basis beginning in 2011. Therefore GRAY and EDWARDS knew that these statements to prospective BELP investors regarding an existing partnership with I-Safe were false and misleading when they made them, and they also knew that such representations were critical to inducing investments in BELP in 2011 and early 2012.

174.    In April 2012, BELP investors were notified that the EVERLOOP-I-Safe partnership had "fallen apart" and that Everloop was looking for a new partner in the education market.   GRAY told investors, however, that EVERLOOP had negotiated an agreement to bring on former NFL player and Syracuse resident Tim Green to facilitate relationships for EVERLOOP with major professional sports leagues and/or teams.  This is represented by GRAY and Devin P. Stelljes as a major new channel for EVERLOOP to gain users and revenue.  Investors were also told by GRAY and Stelljes that Tim Green is an EVERLOOP investor and very interested in helping the company grow in order to enhance his own investment.

175.    As Andrew Russo discovered upon becoming interim CFO, GRAY's description of EVERLOOP'S negotiation of a contract with Tim Green was materially misleading and made so for the express purpose of using Green to attract investments in BELP, because it was GRAY and ARCHIPEL who signed a contract agreeing to pay Tim

Green's fees for his work to promote the EVERLOOP platform because, as was known to and concealed by GRAY, Everloop was deeply insolvent and could not afford the expense.

176.    GRAY made this arrangement and intentionally misrepresented it to Syracuse area investors knowing that Green's is a well-connected and respected celebrity figure in the Syracuse area and that Syracuse-area investors would be induced to buy in to BELP as a result of Green's involvement.

177.    In the Summer of 2012, GRAY arranged to be introduced to a number of potential BELP investors in the Syracuse, New York, area through Ryan McMahon and Andrew Russo. At a series of breakfast, lunch, and dinner meetings in Syracuse, both GRAY and DECESARE knowingly and falsely represented that Everloop was in advanced stage meetings with officials at major league baseball and the National Football League and that deals with these leagues were imminent.

178.    GRAY, EDWARDS and the ARCHIPEL defendants knowingly and intentionally made these false statements in order to induce the Plaintiffs and Class members to invest and/or to continue investing in EVERLOOP through BELP, despite the fact that EVERLOOP was known to them to be insolvent, so that EDWARDS and GRAY could make money on management fees and potentially earn carried interest through their ownership of ARCHIPEL and BIM, as well as to increase their chances of realizing a return on the direct, personal investments in Everloop made by EDWARDS and GRAY.

179.    In addition, in order to induce Plaintiffs and Class members to invest in BELP, defendant GRAY repeatedly called attention to the fact of EDWARDS' and BENNINGTON'S involvement in BELP, EVERLOOP and the other ARCHIPEL Defendants, and that EDWARDS was a senior investment professional who carried the CFA credential - one of the highest

standards of competency and ethics in the finance profession.

180.    At the time of the misstatements and omissions and concealments as described above, GRAY, EDWARDS and the ARCHIPEL Defendants, and each of them, knew or reasonably should have known that such statements were materially false and misleading, and omitted facts required in order to make the statements made, in light of the circumstances under which they were made, not misleading, but knowingly or recklessly make such statements to Plaintiffs and Class members in order to induce them to purchase the investments and the interests.

181.    Plaintiffs and Class members reasonably relied upon the information provided to them, and statements made by the Defendants GRAY, EDWARDS, and the defendant ARCHIPEL companies, including BIM, BENNINGTON and others, and their agents, recommending the purchase of the securities.  At the time of such investments, Plaintiffs and Class members had no knowledge that the information and recommendations provided by GRAY, EDWARDS and the ARCHIPEL Defendants contained misstatements of material facts and omission or concealments of material facts.

182.    Plaintiffs and Class members would not have purchased the securities and investment interests had they known that information contained in the PPMs prepared and provided to them by GRAY, EDWARDS, ARCHIPEL, BIM and BENNINGTON contained misstatements and omissions of material fact regarding GRAY's disciplinary history and licensure, neither would they have invested, and continued to do so, had they not been explicitly lied to by GRAY with regard to Everloop's partnerships with I-Safe, among others.

183.    Plaintiffs and Class members suffered significant loss of their investments as a direct result of the fact that GRAY lied about EVERLOOP's financial health and partnerships

and thus acted in conformity with the actions he took which led to his 2008 censure by NYSE and FINRA, including his "readiness to abuse his customers and his continuing reluctance to acknowledge his misconduct [which] would support higher sanction-consistent with [NYSE and NASD precedent] – even Gray's permanent exclusion from the securities industry," and as a direct result of GRAY, EDWARDS, ARCHPEL, BIM and BENNINGTON having intentionally omitted to disclose the negative professional history of GRAY's in the PPMs.

184.   Defendants GRAY, EDWARDS, the ARCHIPEL Defendants, including BIM, BENNINGTON and BELP, further violated Section 10(b) of the Exchange Act and Rule 10b-5 when GRAY fraudulently commingled and transferred money between the ARCHIPEL Defendant Entities, failed to purchase and deliver the proper number of Twitter shares as promised to, and paid for by Plaintiff and Class members, and as set forth above, engaged in a Ponzi-like scheme by intentionally stealing and commingling money from and among the various ARCHIPEL Entities, preparing and delivering fraudulent purchase confirmations to investors in furtherance of his Ponzi-like scheme, and all of which resulted in further losses and damages to Plaintiffs and Class members as a result of GRAY's fraudulent misrepresentations and maneuverings.

**SECOND CLAIM FOR RELIEF**
**(Pursuant to §20(a) of the Exchange Act)**

185.   Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.  As a result of this Court's rulings in the August 2016 Order, this claim is asserted against Defendant Gray only.  ECF No. 81 at 15-17 (discussing Claim 2 in Plaintiff Goldberg's Amended Complaint).

186.   As set forth above, Defendants GRAY, EDWARDS, ARCHIPEL, the ARCHIPEL Defendants (funds), BIM, BENNINGTON and  BELP have violated the Exchange Act and Rule

10b-5, and each of them, in that they, knowingly and intentionally made repeated misrepresentations and omissions of material fact to Plaintiffs and Class members in connection with the purchase and/or sale of securities for the specific purpose of inducing Plaintiffs and Class members to buy in to the ARCHIPEL Entities' investment vehicles or engaged in scheme to defraud investors.    Further, Plaintiffs and Class members reasonably relied on the misrepresentations and omissions of material fact made by the Defendants and, as a direct result of said misrepresentations and omissions, Plaintiffs and Class members suffered significant monetary losses.

187.    In addition to Defendant GRAY's role as a direct and primary perpetrator of the above stated violations under Section 10(b) of the Exchange Act and Rule 10b-5, Defendant GRAY, at all times relevant herein, was a control person of ARCHIPEL CAPITAL, LLC and every other ARCHIPEL entity Defendant (i.e., BELP, Bloom Energy, Lineagen, Argivida, Late Stage Fund, and the Social Media Funds), and including BIM and BENNINGTON, within the meaning of Section 20(a) of the Exchange Act.

188.    GRAY is a control person within the meaning of Section 20 of the Exchange Act and therefore liable for the above Section 10(b) and Rule 10b-5 violations by virtue of, among other things, GRAY's 65.1% ownership interest in ARCHIPEL, LLC, his roles as a Board Observer of the Everloop Board of Directors, manager of BIM, Advisory Board member of BENNINGTON, and his direct role in the solicitation of investors for the ARCHIPEL Defendants (funds) and BELP.

189. BIM was the Managing Member or General Partner of each of the ARCHIPEL entity funds, including BELP, with broad investment and operational discretion.

190.    GRAY is listed in the PPMs for the ARCHIPEL Entities as a primary contact for BIM, along with EDWARDS.  GRAY, on behalf of BIM, signed all, or substantially all of the subscription agreements for the various ARCHIPEL Entity limited partnerships, including BELP.

191.    GRAY opened separate bank accounts and brokerage accounts for each ARCHIPEL Entity, and has signatory authority on each bank account and trading authorization over each Entity's brokerage account.

192.    GRAY's culpable participation in the above Section 10(b) and Rule 10b-5 violations, for purposes of liability under Section 20(a), is based on, among other things, the fact that he was a primary speaker of the numerous misrepresentations and omissions about his own NYSE/FINRA censure and loss of license as represented in the PPM's, the fact that he personally, knowingly, misrepresented, or caused to be misrepresented by ARCHIPEL employees, the facts regarding EVERLOOP's financial health, partnerships (including but not limited to I-Safe, major league baseball, and the National Football League) and celebrity involvement with Everloop, and also in that he personally and fraudulently operated a ponzi like scheme to defraud investors in the various Archipel Entity investment vehicles.

193.    Defendant EDWARDS is a control person of Defendants GRAY, ARCHIPEL, the ARCHIPEL Entity Defendants, including BELP, as well as BIM, and BENNINGTON, all within the meaning of Section 20(a) of the Exchange Act, and therefore EDWARDS is personally liable for the above described violations of Section 10(b) of the Exchange Act and Rule 10b-5.

194.    Defendant EDWARD's status as a control person is based on, among other things, his 25% ownership of ARCHIPEL, the fact that he is one of two managers of BIM,

listed as a contact person for BIM along with GRAY on the PPM's, he is the sole owner of BENNINGTON, has personal signatory authority on five of the ARCHIPEL Entities' bank accounts—including two with nearly all of the ARCHIPEL Entities' current liquid assets, his membership on the Everloop Board of Directors, and his status as senior, and most influential business partner and mentor to GRAY who has consulted with GRAY approximately three times per week every week since 2006 regarding every investment deal he and GRAY have open, which includes every investment deal involving the ARCHIPEL Entities.

195.    In addition to EDWARD's ability to actually control the actions of GRAY given the dynamics of their professional relationship, EDWARDS' culpable participation in the above Section 10(b) and Rule 10b-5 violations is based on, among other things, the fact that he was the principal architect of the Bennington-Everloop limited partnership, instrumental in intentionally and strategically structuring and naming BELP after his company BENNINGTON in order to separate GRAY from the Everloop investment vehicle so as to allay the concerns of Everloop CEO DECESARE regarding GRAY's disciplinary history, knowing and intentionally allowing the omission of GRAY's disciplinary history in the PPM's and knowingly and/or recklessly allowing the PPM's to be disseminated to prospective investors while he stood to make money from management fees and carried interest, and knowingly and/or recklessly failing to stop GRAY and ARCHIPEL agents from making false representations of material fact regarding Everloop's financial health and partnerships to prospective and current investors, and knowingly and/or recklessly failing to stop or prevent GRAY from operating a Ponzi-like scheme designed to defraud investors.

196.    As a direct and proximate result of GRAY and EDWARDS' conduct as primary perpetrators and/or control persons of the primary perpetrators of the above Section 10(b) and Rule

10b-5 violations, Plaintiffs and Class members suffered damages in connection with their investments in the ARCHIPEL/BIM/BENNINGTON investment vehicles.

## THIRD CLAIM FOR RELIEF
### (RICO - 18 U.S.C. § 1962)

197.     Plaintiffs hereby repeat and re-allege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.  As a result of this Court's rulings in the August 2016 Order, this claim is being asserted against Defendant Gray only. ECF No. 81 at 17-18 (discussing Claim 3 in Plaintiff Goldberg's Amended Complaint).

198.     This claim is distinct and separate from the securities fraud claims, as set forth above, and concerns the fraudulent acts, and each of them, surrounding the Everloop settlement described in detail in ¶ 90 - ¶ 104 of this Second Amended Complaint.

199.     This claim for relief arises under 18 U.S.C. § 1962(a).

200.     The Defendants currently known and unknown additional individuals, and entities, who were parties to the fraud perpetrated by the Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

201.     Plaintiffs and Class members are "persons" as defined in 18 U.S.C. § 1961(3).

202.     Upon information and belief, Defendants GRAY, EDWARDS, BIM, BENNINGTON and others, including the ARCHIPEL partnerships and LLCs, BENNINGTON and entities and the association in fact amongst them constitute "enterprises" within the meaning of 18 U.S.C. § 1961(4), which are engaged in, or activities of which effect or effected, interstate commerce.

203.     Upon information and belief, Defendants engaged in a scheme to defraud Plaintiffs and Class members concerning the settlement negotiations between BELP and EVERLOOP.

This mediation resulted in a settlement for BELP, the full nature and extent of which was never made known to the BELP investors. In fact, rather than explaining to the investor group the nature of the settlement with EVERLOOP and its' officers and directors, GRAY and BIM, EDWARDS and BENNINGTON and the ARCHIPEL COMPANIES refused to allow the BELP limited partners to have any knowledge of the final settlement. A release was forwarded to each of the BELP partners, mandating confidentiality, warning that they were not to talk about the settlement with any of the other investors, and demanding that, if they wanted to obtain the proceeds of the settlement, that they were to sign a release to GRAY, BIM and the ARCHIPEL companies. It was subsequently disclosed by GRAY, that the claim against EVERLOOP was resolved for the sum of $300,000.  This was not true.

204.    This disclosure, and the demand for a release of the general partner and the individuals involved, including Gray and Edwards, was all done by GRAY and BIM in a fraudulent manner.  In fact, after expenses and fees, it is believed and therefore alleged that GRAY and BIM had received for BIM and the BELP partnership the net sum of $650,000. It was GRAY's plan to take $350,000 of the BELP settlement money, and not disclose that taking to the limited partners and investors. GRAY did exactly that, cheating the already defeated BELP investors yet again, this time to the tune of $350,000.

205.    GRAY in fact took $350,000 of the EVERLOOP net settlement proceeds, and unlawfully transferred the money to another one of the ARCHIPEL entities, that was short of funds because of GRAY's illegal acts and takings.  As a result, GRAY fraudulently disclosed a fictitious settlement number, sent the terms of the fraudulent settlement in print to the members of the BELP limited partnership through the US mail, and through e-mail, while at the same time demanding a release for himself and all other ARCHIPEL Owners and Directors as well as

anyone involved with the settlement of the action.

206.    These activities were false, fraudulent, and purposely done by GRAY, EDWARDS, BIM, and BENNINGTON.

207.    It is believed and therefore alleged that the total settlement with EVERLOOP was in the neighborhood of $1,000,000.

208.    In carrying out the scheme, Defendants GRAY, EDWARDS, BIM, and BENNINGTON, and others, including the ARCHIPEL partnerships and LLCs, BENNINGTON operated and through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B) and (5) and in violation of 18 U.S.C. § 1962(c), including acts indictable under 18 U.S.C. § 1341, commonly known as the "Mail Fraud Statute," and 18 U.S.C. § 1343, commonly known as the "Wire Fraud Statute."

209.    Upon information and belief, the Defendants herein, and each of them, individually, jointly, severally, and as a whole participated in the affairs of the enterprising by performing functions necessary or helpful to the enterprise's operations and affairs in conducting a fraudulent settlement.

210.    Upon information and belief, the Defendants engaged in a pattern of racketeering activity described herein with the knowledge that the limited partners of BELP would be defrauded, and injured, that the interstate mails and wires would be used to further the racketeering enterprises identified herein, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, with the knowledge that such mail fraud and illegal utilization of interstate wires was essential to further their fraudulent scheme.

211.    In violation of 18 U.S.C. § 1962, the Defendants aided and abetted each other to perform the violations of the RICO Statute alleged herein as well as the primary acts of mail fraud,

wire fraud, and fraud in the offer or sale of the securities alleged herein, in the interest and the relative limited partnerships in LLCs herein.

212. The described acts of racketeering occurred after the effective date of the RICO Statute, and all within 10 years of each other, and more specifically within the time period from 2011 through 2014.

213. As a direct and proximate result of the RICO violations described herein, Plaintiffs and Class members have been injured and their business and/or property by reason of losses of substantial portions of the money as a result of the fraud concerning the settlement. Plaintiffs and Class members relied upon Gray's and other's misrepresentations and omissions with respect to the settlement agreement, and the Class, and but for those misrepresentations and/or omissions and concealments, Plaintiffs and Class members would not have entered into the settlement agreement.

214. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and Class members are entitled to recover treble damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Fraud)

215. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. As a result of this Court's rulings in the August 2016 Order, this claim is asserted against Defendants Gray, Edwards and Bennington. ECF No. 81 at 18-19 (discussing Claim 4 in Plaintiff Goldberg's Amended Complaint).

216. Plaintiffs and Class members, without knowledge of the falsity of the statements made by Defendants GRAY, EDWARDS, and the ARCHIPEL Defendants, including BIM and BENNINGTON, with regard to Everloop's partnerships, as described above, and of the material omissions and concealments intentionally made by GRAY, EDWARDS, ARCHIPEL, BIM, and BENNINGTON in the PPMs with regard to GRAY's disciplinary history and licensure, as

69

described above, and believing such statements regarding Everloop's partnerships and financial health and the representations made in the PPMs to be true, accurate and complete, and in reasonable justifiable reliance upon the statements and representations made by each of the Defendants, as previously set forth herein, purchased investments and investment interests in reliance upon the truth and completeness of the statements contained in the written materials, including the PPMs and other written and oral statements and representations made by the Defendants, as previously set forth herein.  Plaintiffs and Class members would not have purchased their investments except for reliance upon the representations made by the Defendants offering such investments for sale.

217.    At the time that the statements and representations were made by the Defendants, they were false, the Defendants knew them to be false, and they intended to deceive Plaintiffs and Class members by making such statements and representations to induce investment.

218.    At the time of the false statements, misrepresentations, omissions and concealments set forth above, each of the herein named Defendants intended that Class members, including Plaintiffs, act on the basis of the misrepresentations, omissions and concealments contained in the materials and representations in dealing with whether to purchase the investments and investment interests in which Plaintiffs and Class members reasonably relied thereon to their detriment in making such decision.

219.    All the wrongful acts of the Defendants set forth herein are incorporated by reference.  Each wrongful act alleged constitutes a separate injury suffered by Plaintiffs and Class members.

220.    Had Plaintiffs and Class members known of the material facts which the Defendants wrongfully concealed and misrepresented, and the falsity of Defendants'

representations, Plaintiffs and Class members would not have made any such purchases.

221.    Plaintiffs and Class members, as a result of their purchases and by reason of the Defendants' wrongful concealments, omissions, and misrepresentations, have sustained damages, suffered mental and emotional distress, and have lost a substantial part of their respective investments, together with lost interest in general and incidental damages in an amount yet to be determined, and to be proven at trial.  By reason of the foregoing, the Defendants are jointly, severally, individually, and together liable to Plaintiffs and Class members.

222.    In addition, Defendants' fraudulent acts were willful, wanton, and aimed at the public generally.  Therefore, Plaintiffs and Class members are entitled to punitive damages in such fair and reasonable amount as to a jury of their peers may deem adequate.

### FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

223.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.  As a result of this Court's rulings in the August 2016 Order, this claim is asserted against Defendants Gray, Edwards and Bennington.  ECF No. 81 at 19-21 (discussing Claim 5 in Plaintiff Goldberg's Amended Complaint).

224.    The Defendants owed to Plaintiffs and Class members a duty: (a) to act with reasonable care in preparing and disseminating the information as set forth in the written materials, including the PPMs and other representative materials upon which offered representations that were relied upon by Plaintiffs and Class members in deciding to purchase the investments; and (b) to use such reasonable diligence in determining the accuracy of and preparing the information contained therein, knowing that such information would be relied upon

by the investing public.

225.     The duty of Defendants GREY and EDWARDS to impart correct information on Plaintiffs and Class members arises from the special or privity-like relationship between each of them and the limited partners of the Archipel entities, including BELP.  Specifically, that special or privity-like relationship derives from GREY as a board advisor and EDWARDS as a board member of EVERLOOP and Plaintiffs and Class members as investors/limited partners in BELP. Those posts put GREY and EDWARDS in a position of having information concerning EVERLOOP, including but not limited to its financial health.  This, coupled with the fact that GREY and EDWARDS would receive management fees and interest on profits by BIM through BELP, establishes that these Defendants had a special or privity-like relationship with Plaintiffs and Class members to create a duty to disclose material information, or at the very least, not to conceal and/or lie about information they know to be material and upon which they intend the limited partners to rely in deciding whether or not to invest in the various Archipel entities.

226.     The Defendants breached their duty to Plaintiffs and Class members by failing to investigate, confirm, prepare, and review with reasonable care the information contained in the written materials and other representations, and by failing to disclose to Plaintiffs and Class members, among other things, the facts as alleged above, and in failing to correct the misstatements, omissions, and inaccuracies contained therein at such time as the Defendants knew or reasonably should have known of the misstatements, inaccuracies, concealments, omissions, and misrepresentations.

227.     The representations and/or omissions that Defendants supplied and/or failed to disclose to Plaintiffs and Class members concerning GREY and the investment opportunity in EVERLOOP, were known or reasonably should have been known by the Defendants that

Plaintiffs and Class members would rely on in making an investment decision. As such, Plaintiffs and Class members in relying on these representations invested through BELP in EVERLOOP.

228. The representations that Defendants supplied to Plaintiffs and Class members concerning the settlement agreement reached with BELP and EVERLOOP were also incorrect.

229. As a direct foreseeable and proximate result of the negligence, reckless, and carelessness of the Defendants, and each of them, jointly, severally, individually, and together, Plaintiffs and Class members invested in EVERLOOP and participated in the settlement agreement and have sustained damages, suffered mental and emotional distress, and have lost a substantial part if not all of their investments, together with lost interest, general and incidental damages, all and in an amount yet to be determined and to be proven at trial. By reason of the foregoing, the Defendants are jointly and severally liable to Plaintiffs and Class members.

## SIXTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

230. The plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as though fully set forth herein. As a result of this Court's rulings in the August 2016 Order, this claim is asserted against Defendants Gray, Edwards and Bennington. ECF No. 81 at 21-23 (discussing Claim 6 in Plaintiff Goldberg's Amended Complaint).

231. The Defendants, individually, jointly, severally, and together breached their fiduciary duties to Plaintiffs and Class members.

232. The fiduciary duty of Defendants GREY and EDWARDS to impart correct information on Plaintiffs and Class members arises from the special or privity-like relationship between each of them and the limited partners of the Archipel entities, including BELP. Specifically, that special or privity-like relationship derives from GREY as a board advisor and EDWARDS as a board member of EVERLOOP and Plaintiffs and Class members as

investors/limited partners in BELP.  Those posts put GREY and EDWARDS in a position of having information concerning EVERLOOP, including but not limited to its financial health. This, coupled with the fact that GREY and EDWARDS would receive management fees and interest on profits by BIM through BELP, establishes that these Defendants had a special or privity-like relationship with Plaintiffs and Class members to create a duty to disclose material information, or at the very least, not to conceal and/or lie about information they know to be material and upon which they intend the limited partners to rely in deciding whether or not to invest in the various Archipel entities.

233.    The duties expressly assumed by the Defendants and owed to Plaintiffs and Class members include, *inter alia*:

a.    The duty to act with reasonable care to ascertain that the information set forth in the written materials, including the PPMs and other presentations communicated to and relied upon by Plaintiffs and Class members in deciding to purchase the investments were accurate and did not contain misleading statements or omissions of material facts.

b.    The duty to allow individual representatives selling the investments to act with reasonable care to ascertain that the investment opportunity presented to  Plaintiffs and Class members was suitable and in accordance with their investment goals and intentions by providing such representatives truthful information concerning such investments.

c.    The duty to deal fairly and honestly with Plaintiffs and Class members.

d.    The duty to avoid placing itself, himself or themselves in situations involving a conflict of interest with Plaintiffs and Class members.

e.  The duty to manage the accounts of Plaintiffs and Class members and to manage and operate the investments and investment interest exclusively for the best interest of Plaintiffs and Class members.

f.  The duty to make recommendations and execute transactions in accordance with the goals, investment objectives, permissible degree of risk, and instructions to Plaintiffs and Class members, and in the manner and method upon which the Defendants indicated that they would make such executions of transactions.

234.  The Defendants failed to fulfill their fiduciary duties owed to Plaintiffs and to Class members in the following respects:

a.  Failing to act with reasonable care to ensure that the information set forth in the written materials and other presentations communicated to and relied upon by the Plaintiffs and Class members in deciding to purchase the investments was accurate and did not contain misleading statements or omissions of material facts.

b.  Failing to act with reasonable care to provide truthful sales information to representative agents to ensure that the investment opportunity presented to Plaintiffs and Class members was suitable and in accordance with their investment goals and intentions.

c.  Engaging in transactions which resulted in a conflict of interest between the Defendants and Plaintiffs and Class members whose financial interest in the Defendants, the Defendants had undertaken to advance, supervise, manage and protect.

      d.      Failing to adequately and fully disclose to Plaintiffs and Class members the full context and nature of the conflicts of interest in which the Defendants and their affiliates would be engaging.

      e.      Profiting and allowing Defendants and their affiliates to profit at the expense of Plaintiffs and Class members.

      f.      Engaging in transactions that were designed to and did result in profit to the Defendants and their affiliates at the expense of Plaintiffs and Class members.

235.    The acts of the Defendants in breaching their fiduciary obligations owed to Plaintiffs and Class members show a willful indifference to the rights of  Plaintiffs and Class members.

236.    As a proximate result of the Defendants' breaches of their fiduciary duties, Plaintiffs and Class members have sustained damages, suffered mental and emotional distress, and have lost a substantial part of their investments, together with lost interest in general and incidental damages in an amount yet to be determined and to be proven at trial.

237.    By reason of the foregoing, the Defendants are jointly and severally liable to Plaintiffs and Class members.

238.    In addition, the Defendants' acts were willful, wanton, and in reckless disregard of the rights of the consuming public and specifically the Plaintiffs herein, and aimed at the public generally. Therefore Plaintiffs and Class members are entitled to punitive damages written representation.

## SEVENTH CLAIM FOR RELIEF
### (Conversion)

239.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.  As a result of this Court's rulings in the August 2016

Order, this claim is asserted against Defendant Gray only.  ECF No. 81 at 23-25 (discussing Claim 7 in Plaintiff Goldberg's Amended Complaint).

240.    Plaintiffs and Class members are the rightful owner of monies paid to the Defendants for securities, investment interests, and security interests that were sold by the Defendants to Plaintiffs and Class members under false pretenses.

241.    Plaintiffs' and Class members' interests in these monies is superior to any interest of the Defendants that they may have in the aforesaid monies.

242.    In unlawfully taking Plaintiffs' and Class members' monies and controlling and expending the funds for their own purposes, Defendants have converted funds belonging to Plaintiffs and Class members, and have otherwise injured Plaintiffs and Class members.

243.    Defendants have intentionally exercised dominion and control over such funds in a manner inconsistent with and in willful disregard of Plaintiffs' and Class members interests.

244.    As discussed in ¶ 101 above, Plaintiffs and Class members have made demand for their monies.

245.    As a result of the conversion of Plaintiffs' and Class members' monies, Plaintiffs and the Class have been damaged in an amount to be determined at trial.

246.    In converting these monies, the Defendants, both individually, together, jointly, and severally, acted willfully, wantonly, and knowing and in reckless disregard of the rights of Plaintiffs and Class members and the consuming public.  Accordingly, an award of punitive damages is appropriate, and in the public interest.

## EIGHTH **CLAIM FOR RELIEF**
### (Unjust Enrichment)

247.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.  As a result of this Court's rulings in the August 2016 Order, this claim is asserted against Defendant Gray only.  ECF No. 81 at 26-28 (discussing Claim 9 in Plaintiff Goldberg's Amended Complaint).

248.   Defendants received money or property belonging to or provided by Plaintiffs and Class members in this action.

249.   Defendants benefited from the receipt of the money and/or property.

250.   There were connections between the Defendants and Plaintiffs and Class members to establish a relationship between the parties that caused reliance and inducement.  The relationship as between GREY and EDWARDS and Plaintiffs and Class members derives from GREY as a board advisor and EDWARDS as a board member of EVERLOOP and Plaintiffs and Class members as investors/limited partners in BELP.  Those posts put GREY and EDWARDS in a position of having information concerning EVERLOOP, including but not limited to its financial health.  This, coupled with the fact that GREY and EDWARDS would receive management fees and interest on profits by BIM through BELP, establishes that these Defendants had a relationship with Plaintiffs and Class members to cause reliance.

This establishes that these Defendants had a relationship with Plaintiffs and Class members to cause reliance.

251.   Under principals of equity and good conscience, Defendant should be required to pay back Plaintiffs and Class members the amount of the unjust enrichment.

### NINTH CLAIM FOR RELIEF
#### (New York Debtor and Creditor Law § 273)

252.   Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.  As a result of this Court's rulings in the August 2016

Order, this claim is asserted against Defendant Gray only.  ECF No. 81 at 28-30 (discussing Claims 10, 11, 12, and 13 in Plaintiff Goldberg's Amended Complaint).

253.    The Defendants incurred or caused to be incurred obligations without fair consideration, rendering themselves insolvent.

254.    These obligations include the various amounts owed to Plaintiffs and Class members as a result of their investments.

255.    As a result of the foregoing, Defendants owe substantial sums to Plaintiffs and Class members in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF
### (New York Debtor and Creditor Law § 274)

256.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.  As a result of this Court's rulings in the August 2016 Order, this claim is asserted against Defendant Gray only.  ECF No. 81 at 28-30 (discussing Claims 10, 11, 12, and 13 in Plaintiff Goldberg's Amended Complaint).

257.    The Defendants made conveyances without fair consideration leaving remaining property to constitute an unreasonably small capital.

258.    Such conveyances included various improper payouts to the Defendants, their employees, their families, and friends.

259.    As a result of the foregoing, the Defendants owe substantial sums to Plaintiffs and Class members, in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### (New York Debtor and Creditor Law § 275)

260.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.  As a result of this Court's rulings in the August 2016

Order, this claim is asserted against Defendant Gray only.  ECF No. 81 at 28-30 (discussing Claims 10, 11, 12, and 13 in Plaintiff Goldberg's Amended Complaint).

261.    Defendants made conveyances without fair consideration intending or believing that they would incur debts beyond their ability to pay as they matured.

262.    Such conveyances including various improper payouts to the Defendants, their employees, families, and friends.

263.    As a result of the foregoing, Defendants owe substantial sums to Plaintiffs and Class members, in an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF
### (New York State Debtor and Creditor Law § 276)

264.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.  As a result of this Court's rulings in the August 2016 Order, this claim is asserted against Defendant Gray only.  ECF No. 81 at 28-30 (discussing Claims 10, 11, 12, and 13 in Plaintiff Goldberg's Amended Complaint).

265.    The Defendants made conveyances and incurred obligations with actual intent to hinder, delay or defraud either present or future creditors.

266.    Such conveyances included various improper payouts to the Defendants, the Defendants' employees, families, and friends.

267.    As a result of the foregoing, Defendants owe substantial sums to Plaintiffs and Class members, in an amount to be determined at trial.

**WHEREFORE,** Plaintiffs, on behalf of themselves and all others similarly situated, request the following procedural orders and demands judgment against the Defendants, equitable relief, and damages as follows:

1.      An order certifying the proposed Class of investors, together with any necessary or appropriate subclasses, under the Federal Rules of Civil Procedure, Rule 23, and appointing the Plaintiffs and their counsel to represent the Class;

2.      Compensatory damages in amount estimated to exceed the sum of $7,000,000.00;

3.      Consequential damages in an amount to be determined at trial;

4.      Treble damages for the Defendants civil RICO violations of 18 U.S.C. § 1961, *et seq.*;

5.      General damages for all injuries resulting from the negligence, fraud, breaches of contract, and breaches of fiduciary duty committed by the Defendants, individually, jointly, severally, or together in an amount to be ascertained at trial;

6.      Disgorgement and restitution of all earnings, profits, compensation, and benefits received by the Defendants as a result of their unlawful acts and practices;

7.      Costs and disbursements of this action;

8.      Reasonable attorney's fees incurred in the prosecution of this action and otherwise;

9.      Punitive damages for the willful, wanton, and reckless disregard of the rights of the consumers and the investing public, including Plaintiffs and Class members herein, and such reasonable amount as may be determined by the court or a jury; and

10.     Such other and further relief as to the court may seem just and proper.

**DATED:**      December 22, 2017
             Syracuse, New York

                                        **CHERUNDOLO LAW FIRM, PLLC**

By:  *s/John C. Cherundolo*

John C. Cherundolo, Esq.
Bar Roll No.: 101339

*Attorneys for the Plaintiffs*
Office and P.O. Address
AXA Tower I, 17th Floor
100 Madison Street
Syracuse, New York 13202
(315) 449-9500

**WILENTZ, GOLDMAN & SPITZER, P.A.**

By:  s/*Kevin P. Roddy*

Kevin P. Roddy, Esq.
Bar Roll No.: 520400
*Attorneys for Plaintiffs*
Office and P.O. Address
90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, New Jersey 07095
(732) 636-8000