UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

STEVEN AMERIO and ANDREW GOLDBERG,

                    Plaintiffs

         -v-                            5:15-CV-538

GREGORY W. GRAY, JR.; GREGORY P.
EDWARDS; ARCHIPEL CAPITAL LLC; BIM
MANAGEMENT LP; and BENNINGTON
INVESTMENT MANAGEMENT, INC.

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                         OF COUNSEL:

CHERUNDOLO LAW FIRM, PLLC      JOHN C. CHERUNDOLO, ESQ.
Attorneys for plaintiffs and intervenors  J. PATRICK LANNON, ESQ.
AXA Tower One 17th Floor
100 Madison Street
Syracuse, New York 13202

WILENTZ GOLDMAN & SPITZER PA   KEVIN P. RODDY, ESQ.
Attorneys for plaintiffs
90 Woodbridge Center Drive, Suite 900
Woodbridge, New Jersey 07095

JAMES TONREY ESQ.            JAMES E. TONREY, JR., ESQ.
Attorneys for plaintiffs
144 Pinewood Avenue
Staten Island, New York 10306

GREGORY W. GRAY, JR.
Defendant *pro se*
60 School Street #1192
Orchard Park, NY 14127

TARTER KRINSKY & DROGIN LLP   MICHAEL J. GRUDBERG, ESQ.
Attorneys for defendants Edwards
and Bennington Investment
Management, Inc.
1350 Broadway
New York, New York 10018

DAVID N. HURD
United States District Judge

## **MEMORANDUM–DECISION and ORDER**

## **CONTENTS**

I.   INTRODUCTION ..................................................................................................2

II.   BACKGROUND ....................................................................................................4

III.  LEGAL STANDARD ..........................................................................................12

  A.   Default Judgment. ......................................................................................12

  B.   Summary Judgment. ..................................................................................12

IV.  DISCUSSION ....................................................................................................13

  A.   The Motion to Intervene. ............................................................................13

  B.   Edwards' Motion for Summary Judgment. .................................................16

     1.   Securities Fraud...................................................................................17

     2.   Common Law Fraud. ...........................................................................26

     3.   Negligent Misrepresentation. ..............................................................27

     4.   Breach of Fiduciary Duty. ...................................................................30

  C.   Plaintiffs' Claims Against Bennington. ........................................................33

  D.   Plaintiffs' Motion for Default Judgment. .....................................................33

     1.   Facts Attributable to Each Defendant. ................................................34

     2.   Securities Fraud...................................................................................36

     3.   Common Law Fraud. ...........................................................................37

     4.   Negligent Misrepresentation. ..............................................................37

     5.   Breach of Fiduciary Duty. ...................................................................39

     6.   Plaintiffs' Remaining Claims Against the Archipel Defendants. ..........39

  E.   Plaintiffs' Claims Against Gray. ..................................................................39

V.   CONCLUSION ..................................................................................................40

## **I.**    **INTRODUCTION**

Plaintiffs Andrew Goldberg ("Goldberg") and Steven Amerio ("Amerio", together

"plaintiffs") were two of more than one hundred investors who found themselves

disappointed—to say the least—with the venture capital opportunities presented by the several defendants assembled in this case.  Although the financial loss that they suffered varies, the narrative they present and the culprits they identify are the same.

Among those culprits is Gregory Gray ("Gray"), the founder and architect of a series of investment vehicles under the brand name Archipel ("the Archipel entities").  As a structure to orchestrate the Archipel entities, Gray founded Archipel Capital, LLC ("Archipel"), a New York limited liability company that served as a brand Gray used in advancing investment opportunities to clients.  Gray also founded BIM Management LP ("BIM"), a Delaware limited partnership that provided the operational apparatus to manage the Archipel entities.

In addition to Gray, defendant Gregory Edwards ("Edwards") was also a partner of BIM, and plaintiffs allege that Edwards is also culpable for the economic harm they have sustained.  Edwards' own company, Bennington Investment Management, Inc. ("Bennington"), a Canadian corporation, also counts among the list of those that plaintiffs would hold accountable.

In brief, plaintiffs allege that defendants swindled, comingled, and generally mismanaged the funds with which they were entrusted.  As a result, on April 30, 2015, plaintiffs filed a complaint in this District.  The Second Amended Complaint ("the SAC"), the current operative pleading, asserts the following three counts under federal law:  (I) securities fraud under § 10(b) of the Securities and Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b) and the corresponding Rule 10b-5 of the Code of Federal Regulations, 17 C.F.R. § 240.10b-5, ("Rule 10b-5"); (II) Control Person Liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; and (III) a violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.  Additionally, plaintiffs assert the following nine state law claims:  (IV) common law fraud; (V) common law negligent misrepresentation;

3

(VI) common law breach of fiduciary duty; (VII) common law conversion; (VIII) common law unjust enrichment; and (IX-XII) claims under New York's Debtor and Creditor Law §§ 273-76.

Three motions are presently under consideration. First, five other frustrated investors in the Archipel entities, Andrew C. Russo, Caroline Hardman, Lee Knight, Todd Morakis ("Morakis"), and David Work (together "the intervenors"), have moved to intervene and be joined into this action as plaintiffs. Second, Edwards and Bennington have moved for summary judgment on the four counts of the SAC that remain against them: (I) securities fraud; (IV) fraud; (V) negligent misrepresentation; and (VI) breach of fiduciary duty. Third and finally, plaintiffs have moved for default judgment against Archipel and BIM, neither of whom have appeared or defended this action. Those motions having been fully briefed, they will now be decided based on the parties' submissions without oral argument.

## II.   <u>BACKGROUND</u>

From 1996 until the early 2010s, Gray held several jobs at several companies in the securities industry. See Dkt. 279-4 ("Gray Dep."), pp. 4-5.[1] Gray's somewhat nomadic career was forced to take a detour on December 17, 2008, when the New York Stock Exchange (the "NYSE") barred him from "acting in any capacity with a member firm for three years." Dkt. 279-7, p. 10. In sum and substance, Gray was accused of mismanaging and comingling his clients' funds and, upon his errant trades being discovered, harassing his clients to coerce their silence. *Id.* at 10-17. On July 22, 2009, the Securities Exchange Commission (the "SEC") upheld the NYSE's censure. *Id.* at 9.

Ostracized from the traditional brokerage industry for at least three years, Gray decided to take a different approach. In 2008 or 2009, he reached out to Edwards, a veteran investment advisor out of Canada who had engaged a group of investors in a few startup

---

[1] Pagination corresponds with CM/ECF.

4

opportunities Gray had proposed to him.  *See* Dkt. 279-3 ("Edwards Dep."), pp. 5-6.  Gray

now had a new enterprise of his own in the works and wanted Edwards to join him.  *Id.*

In March of 2008,[2] Gray's successor at the investment firm through which he had met

Edwards "casually mentioned" Gray's discipline to Edwards over the phone.  Edwards

Dep. 7.  On November 5, 2008, Edwards sent Gray an email chastising him for keeping his

punishment secret, going so far as to call him "pathetic."  *Id.* at 26-27.  According to Edwards,

he asked later that same year that Gray explain how the discipline came to pass.  Dkt. 273-1

("Edwards Dec."), ¶ 12.  Apparently satisfied with Gray's explanation, Edwards accepted

Gray's offer to go into business together and joined Archipel's advisory board.  *Id.* at ¶ 12;

Edwards Dep. 7.

As a member of Archipel's board, Edwards' role was that of a "technical advisor."

Edwards Dep. 40.  He describes his responsibilities at Archipel as involving valuation,

financial analysis, deal terms, and structure.  *Id.* at 23.  As to whether a particular investment

was suitable, he left that to Gray.  *Id.*  In any case, he visited Archipel's offices in Buffalo

approximately four times over four years to meet with Gray but did not supervise him or any

other Archipel employee.  Edwards Dec. ¶ 14.

To that end, some explanation is necessary as to how Archipel and its varied entities

worked.  First, Archipel would identify a company looking for investors.  Dkt. 279-6, p. 20.

Often, these companies were either nascent, or otherwise looking to grow and expand

without offering public stock.  *Id.* at 17.  Archipel would then seek out investors, who would

purchase shares not in the company itself, but in an Archipel entity.  *See* Dkt. 279-8, pp. 7-8

(describing the function of one particular Archipel entity that invested in Twitter).

---

[2] The parties dispute whether Edwards discovered Gray's disciplinary history in March or November of 2008.
However, because neither party disputes that Edwards was aware of the discipline by the time he joined
Archipel, that dispute is immaterial.

The Archipel entities were each limited partnerships and each investor became a limited partner of the entity by purchasing its shares.  *See* Dkt. 279-8, pp. 7-8.  Despite being a general partnership itself—with Gray and Edwards as its general partners—BIM was the general partner of each Archipel entity.  Dkt. 279-6, p. 18; s*ee, e.g.*, Dkt. 279-8, p. 7.  As such, BIM was tasked with managing the entities, in exchange for taking five percent of the investment pool as a management fee.  *See id.* at 8.

Once the entity reached a critical mass of investors, it would invest in the targeted company.  *See* Dkt. 279-8, pp. 7-8.  If all went well, the target would flourish with the investment, grow in value through the extra funds and the network afforded by Archipel, and then the Archipel entity would cash out and collect a profit.  *See id.*; Gray Dep. 5.  In any case, when an Archipel entity sold its invested stock, it would first repay the limited partners until they received their investment back, with ten percent of any further profit going to BIM and the remaining ninety percent getting distributed to the limited partners proportionally to their initial investment.  Dkt. 279-8, p. 7.

Instrumental in each Archipel entity transaction was each entity's Private Placement Memorandum ("PPM"), a document that detailed how the entity worked.  *See generally, e.g.*, Dkt. 279-8.  Each PPM explained the structure of its corresponding Archipel entity and the payment structure should an investment pay off.  *See id.*  The PPMs also provided a brief biography of Edwards, Gray, and Archipel's Managing Director, Devin Stelljes ("Stelljes"), and identified that the three of them would "manage [BIM, as general partner of the Archipel entity,] and oversee its operations[.]"  *Id.* at 11.  Edwards' biography, listed first, is the most extensive.  *See id.*  However, that description is silent as to what role he actually occupied at Archipel.  *Id.*

As for Gray, most of the PPMs make no mention of his disciplinary history, and in fact list him as a "registered investment advisor" with active licenses.  *See* Dkt. 279-8, p. 11.  Only the Late Stage Fund LP PPM, created in 2014, notes his prior securities violation as a risk factor and acknowledges only that he passed the requisite tests to receive his licenses. Dkt. 279-12, pp. 10-12.  Edwards does not recall whether he suggested to Archipel's counsel that the PPMs should acknowledge Gray's disciplinary history.  Edwards Dep. 19.  Edwards did, however, discuss with Gray whether his discipline should be included in the PPMs because he believed that an investor should know of a sufficiently serious disciplinary action. *Id.*  Outside of his discussion with Gray and providing his biography, Edwards' only interaction with the PPMs was to give cosmetic comments on an early draft.  *Id.* at 14.

Having ironed out a fundamental structure, Archipel set to finding companies in which to invest.  One Archipel investment opportunity began to come together in December of 2010, when Edwards met Hilary DeCesare ("DeCesare") at a conference.  Dkt. 279-5, p. 15. DeCesare was a co-founder and CEO of Everloop, a "security company to keep kids safe online."  *Id.*  Hoping to secure funding for Everloop, DeCesare gave an investment pitch to an audience of roughly 200 people, among them Edwards.  *Id.*  Edwards was convinced and wanted to meet with DeCesare to discuss her working with Archipel to raise capital.  *Id.*

Early in 2011, DeCesare met with Gray to discuss working together, but found herself put out by his attitude, which she described as "very arrogant."  Dkt. 279-5, p. 16.  Shortly after that poor first impression, she told Edwards that she did not want to work with Gray.  *Id.* DeCesare's opinion of Gray only soured further later that year when she discovered his disciplinary history.  *Id.* at 24.

To allay her burgeoning concerns, Gray sent DeCesare an email, which Edwards had reviewed, detailing his narrative of the NYSE disciplinary process.  Edwards Dep. 52-53.  As

a final concession to DeCesare's concerns, Gray and Edwards agreed that the name of the investment vehicle would be Bennington-Everloop LP ("BELP"), instead of the originally proposed Archipel-Everloop LP, so that Edwards' company, and by implication Edwards, would have a stronger association with the investment entity.  *Id.* at 52.

Having collected a growing crop of investment opportunities, Archipel began looking for investors.  Among those new investors was plaintiff Andrew Goldberg, a retired college graduate.  Dkt. 273-3 ("Goldberg Dep."), p. 3.  Through pure happenstance, Goldberg was put in contact with Devin Stelljes ("Stelljes"), an Archipel employee.  Goldberg Dep. 8.  The two eventually met in person, and Stelljes pitched this plaintiff an opportunity to invest in BELP.  Dkt. 279-1, p. 13; Dkt. 279-13, p. 6.  During that meeting, Stelljes never mentioned Edwards.  Goldberg Dep. 9.  Stelljes' silence regarding Edwards perhaps stemmed from his lack of understanding as to what Edwards did at Archipel and the fact that he "didn't meet with [Edwards] much."  Dkt. 279-5, p. 6.

Three months later, Goldberg invested $100,000 in Everloop through BELP.  Goldberg Dep. 9.  Goldberg would ultimately invest an additional $200,000 of his money through Archipel entities, with $50,000 each going to companies called Bloom Energy ("Bloom") and Agrivida, and $100,000 going to the social media company Twitter.  *Id.*

Goldberg did not communicate with Edwards prior to any investment in an Archipel entity.  Goldberg Dep. 10.  Instead, he spoke with Gray and Stelljes before making each investment.  *Id.* at 9-10.  In fact, Goldberg is unsure when he first heard Edwards' name.  *Id.* at 12.  However, at some point before 2014, Goldberg learned that Edwards was a Certified Financial Advisor, which impressed him.  Dkt. 279-1, pp. 40-41.

Goldberg's counterpart plaintiff, Steven Amerio, is also a college graduate, and has spent his entire career in the investment industry.  Dkt. 273-4 ("Amerio Dep."), pp. 3-6.

8

Amerio first heard about Archipel through his friend, proposed intervenor Todd Morakis.  *Id.* at 9.  Both Amerio and Morakis work in finance, and Morakis mentioned that he had been investing through Archipel and suggested to Amerio that he could also get involved.  *Id.* at 3-5, 9.  Amerio held Morakis' opinion and intelligence in high regard, and as a result when Morakis described Gray as a "standup individual" and a "good guy," Amerio was intrigued. *Id.* at 10-11.  Accordingly, Morakis introduced Amerio to Gray, who persuaded Amerio to invest in Bloom.  *Id.* at 9.  At the time he invested, Amerio was aware that venture capital investments carry a high degree of risk.  *Id.* at 15.

Although Amerio does not recall Edwards being discussed by an Archipel employee prior to his investment in Bloom—and he distinctly recalls that Morakis never mentioned Edwards—he remembers that Gray would often refer to his "partner."  Amerio Dep. 10.  In fact, Amerio does not recall hearing Edwards' name at all before he invested, but he does believe that he read his name in the Bloom PPM.  *Id.*  As a result, although Amerio did not communicate with Edwards directly before investing in Bloom, he was nevertheless aware of Edwards' extensive credentials as an investment advisor and assumed that he was Gray's partner.  *Id.* at 12.  Amerio describes those credentials as a factor in his decision to invest in Bloom.  *Id.*

Nevertheless, Amerio had "no idea" whether Edwards would be involved in administering the investments in Bloom.  Amerio Dep. 13.  Throughout Amerio's time as a Bloom investor, he never spoke to Edwards, not even by email.  *See id.* at 27.

At some point, Goldberg's sister also became an investor in Archipel at Goldberg's suggestion.  Goldberg Dep. 26.  However, as she communicated with Gray, something in his attitude struck a wrong chord with her, and so she searched him on Google.  *Id.* at 15.

Through that internet search, Goldberg's sister came across Gray's NYSE disciplinary history, which she of course promptly shared with her brother.  *Id.*

Goldberg called Gray and Stelljes frequently after the revelation of Gray's past, because his trust in Gray was, perhaps understandably, diminished.  Goldberg Dep. 16. After all, he felt that Gray "had essentially lied to [him] by not" disclosing his discipline.  *Id.* Although Goldberg expressed a desire to "get past" the issue of Gray's failure to disclose his disciplinary history and did not leave Archipel, he began to closely scrutinize his investments in Everloop and Twitter.  *Id.*  As a result, Goldberg and Gray had frequent arguments, during some of which Gray "threatened" to sell off Goldberg's Twitter shares.  *Id.* at 17.  Although Goldberg considered this a threat because he believed that his Twitter investments could become valuable, he nevertheless encouraged Gray to find him a buyer for his shares so that the two of them would no longer work together.  *Id.*

On June 10th, 2014, Gray and Goldberg launched into another argument over email as to the amount of Twitter shares to which Goldberg was entitled.  *See* Dkt. 279-1, p. 32; 279-22, pp. 7-8.  As the argument escalated, Goldberg forwarded the email chain concerning the dispute to Edwards, as well as Archipel's attorney.  Dkt. 279-1, p. 32; 279-22, pp. 7-8.  Upon being included in the argument, Edwards did not respond, and did not check Gray's math.  Edwards Dep. 39.  Instead, Edwards urged Gray not to respond because he did not believe that Goldberg was capable of having a rational conversation on the issue.  *Id.* At the same time, Edwards reached out to Archipel's counsel to ask him to reassure Goldberg that "all numbers and documents will be rechecked or something to that effect."  *Id.* at 40.

Unfortunately for Goldberg, he would soon be proved right to be concerned about Gray's candor, and unfortunately for Gray he had bigger concerns ahead than Goldberg's ire.

The facts surrounding Gray's indictment by the United States Attorney's Office for securities fraud have already been recounted in the twin to this case, *McEssy v. Gray*, 2019 WL 6829053 (N.D.N.Y. Dec. 13, 2019), and need not be recounted at great length.

Suffice it to say, the Archipel entities yielded few returns.  *See McEssy*, 2019 WL 6829053, at *5.  In fact, only the Twitter investment produced any positive returns to its Archipel investors.  *Id.*  To cover for those losses and keep Archipel afloat, Gray had used a majority of the funds raised to purchase Twitter shares to instead provide an appearance of profit to investors in the other Archipel entities.  *Id.*  Desperate to keep his house of cards standing for every second he could, Gray sought out William McEssy ("McEssy"), the most substantial Archipel investor, and presented him with an opportunity to purchase $5,000,000 worth of Uber stock.  *Id.* at *6.

But of course, the Uber stock did not exist.  *McEssy*, 2019 WL 6829053, at *6.  Instead, Gray used McEssy's funds to finally purchase the Twitter shares that he had failed to purchase when he had originally promised to because he instead used the money to paper over his earlier bad bets.  *Id.*  The SEC began to investigate Gray, and he pled guilty to securities fraud and perjury on December 23, 2015.  *Id.* at *7.  For his part, Edwards has declared that he was unaware of Gray's comingling of funds and unauthorized withdrawals until at least February of 2015, and never condoned it.  Edwards Dec. ¶ 16.

Needless to say, Gray's guilty plea cued Archipel's requiem, but Goldberg and Amerio had already filed this suit on April 30, 2015 in an effort to recover the money they had lost.  Dkt. 1.  The case proceeded through discovery, but when discovery ended, no motion practice followed.  Defendants BIM and Archipel never appeared to defend plaintiffs' suit, and thus on April 19, 2018 plaintiffs received an entry of default against them.  Dkt. 160.

To streamline plaintiffs' claims against the other defendants into a format ready for trial, the Court issued a Memorandum-Decision and Order reopening the deadline to make dispositive motions on March 31, 2020.  Dkt. 266.  Plaintiffs moved for default judgment against Archipel and BIM on April 15, 2020, and to intervene five additional plaintiffs on April 22, 2020. Dkt. 267; 268.  The moving defendants moved for summary judgment against all claims against them on May 12, 2020.  Dkt. 273.  Plaintiffs' claims against Gray, however, remain undisturbed.

### III.   LEGAL STANDARD

#### A.  Default Judgment.

Under Rule 55, a district court may grant default judgment against a party for the failure to plead or otherwise defend an action. FED. R. CIV. P. 55; *see Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993).  A party moving for default judgment must first attain an Entry of Default from the Clerk of the Court.  FED. R. CIV. P. 55(a).  Once the party attains an entry of default, they must serve the defendant with written notice of the application for default judgment under Rule 55(b)(2).  Once default has been established as proper, the party moving for default is "entitled to all reasonable inferences from the evidence offered," but a district court still must determine whether the allegations establish liability as a matter of law. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

#### B.  Summary Judgment.

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  Only after the moving

party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Id.* at 273.

The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Instead, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  In short, summary judgment is the point in litigation where the record evidence is assembled to assess whether there exist any material disputed facts that necessitate trial, and thus the point at which the parties must "put up or shut up." *Weinstock v. Colum. Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## IV.  **DISCUSSION**

There are three motions currently under consideration:  (1) the intervenors' Rule 24(b) motion to intervene; (2) Edwards' and Bennington's motions for summary judgment in their favor; and (3) plaintiffs' motion for default judgment against BIM and Archipel.

### A. **The Motion to Intervene.**

A district court has broad discretion to grant a Rule 24(b) motion to intervene, but the intervenors must first prove that their motion is timely.  *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 69-70 (2d Cir. 1994) (ruling that "intervention decisions are reviewed under an abuse of discretion standard" and making timely motion is "first hurdle").  If the motion is timely, then the intervenors must show that they pleaded a claim that shares a similar

13

question of law or fact with the plaintiffs' original claim. FED. R. CIV. P. 24(b)(1)(B), (c); *see also Greer v. Blum*, 462 F. Supp. 619, 625 (S.D.N.Y. 1978) (requiring that the claim with the motion to intervene be substantially similar to the original claim).

To satisfy the threshold timeliness inquiry, a court weighs, in its discretion:  (1) how long the intervenors had notice before they moved to intervene; (2) resulting prejudice to existing parties if intervention were permitted; (3) potential prejudice to the intervenors from denial of intervention; and (4) any unusual circumstances. *Pitney*, 25 F.3d 66 at 70.[3] However, the first factor—the duration of notice—is typically given greater weight than its fellows. *Catanzano ex rel. Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996).

In considering the timeliness of a motion to intervene, the court has discretion to determine how long the intervenors had notice or should have had notice of their interest in the original claim before moving. *See Catanzano*, 103 F.3d at 232.  In making that determination, the court first considers which event triggered the intervenors' notice of their interest in the claim being put at stake. *See Chen-Oster v. Goldman Sachs & Co.*, 2015 WL 4619663 at *6 (S.D.N.Y. Aug. 3, 2015), *aff'd* 2016 WL 11645644 (S.D.N.Y. June 6, 2016).

For interventions involving class actions, a party is deemed on notice once she learned or should have learned that class certification was denied. *See Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 353-54 (1983) (emphasizing parties' ability to intervene after denial of class certification); *Hnot v. Willis Group Holdings, Ltd.*, 234 F. App'x. 13, 14-15 (2d. Cir. 2007) (summary order) (same).

Furthermore, Rule 24 requires that intervenors promptly move to intervene when they receive notice that their interests might not be protected rather than waiting until the danger

---

[3] Although *Pitney* considered whether intervention was timely for plaintiffs intervening under Rule 24(a), the analysis of the timeliness of intervention under Rule 24(b) is treated the same. *See Hnot v. Willis Group Holdings, Ltd.*, 234 Fed.Appx. 13, 14 (2d Cir. 2007) (summary order) (applying *Pitney's* four timeliness factors to a Rule 24(b) motion); *Kamdem-Ouaffo v. Pepsico, Inc.*, 314 F.R.D. 130, 134 (S.D.N.Y. 2016) (same).

to that interest becomes certain. *Floyd v. City of New York*, 302 F.R.D. 69, 86-87 (S.D.N.Y. 2014) (noting that "intervention law required [the intervenors] to move at the first instance that there was some doubt [that their interests were not protected in the action]"), *aff'd in part, appeal dismissed in part*, 770 F.3d 1051 (2d Cir. 2014).

The moving defendants principally argue that the potential intervenors' motion is untimely because they were put on notice when the Court denied class certification seven months ago.  They also argue that they would be prejudiced by the intervention because they would have to conduct discovery to ascertain the intervenors' individual claims and theories of the case.  Lastly, they point out that intervention would disserve the Court because it would likely delay trial and a final resolution of the case.

For their part, the intervenors argue that it is common practice for parties who had their class certification denied to subsequently intervene.  They further explain that it took around seven months to file the motion because of the holidays and the general disruption caused by the COVID-19 pandemic.  The intervenors also argue that they are not adding any new allegations to the action, and so would not unduly prejudice the defendants.  Critically, however, the intervenors point to no potential prejudice from a denial of intervention.

The lack of any articulated prejudice, combined with the extended, seven-month delay after class certification was denied on September 3, 2019, demands that the intervenors' motion be denied.  *Compare* Dkt. 268 (intervenor's motion dated April 22, 2020), *with* Dkt. 252 (denying class certification dated September 3, 2019).  The intervenors' explanation that the holidays delayed their motion cannot justify their delay.  The holidays come every year, at the same time of year—roughly three months after the intervenors were denied class certification—and yet countless motions are filed, rebutted, and decided during that span.

The intervenors' argument that the COVID-19 pandemic also delayed their motion may have carried some weight but for one point:  this Court never stopped accepting and deciding motions.  As a result, although the pandemic may have made it more difficult to compile the necessary information to move to intervene, it fell far short of making it impossible.  Additionally, the intervenors were already represented by plaintiffs' counsel, who are intimately familiar with the case, and by extension any need to compile the intervenors' information and allegations before moving would have been greatly reduced.  Accordingly, the intervenor's motion is not timely.

This is especially true because the fraud claims the intervenors assert are necessarily distinct from the existing plaintiffs'.  Each investor in the Archipel entities will present novel considerations in their investments and unique interactions with defendants.  Accordingly, granting the intervenors' motion would require discovery to be reopened.  This case is rapidly approaching its conclusion, in fact the entire purpose of the motion practice currently under consideration is to prepare this case for trial.  *See generally* Dkt. 266.

The intervenors' justifications thus do not justify such a substantial step backwards in the resolution of this case, and their motion must be denied.  *See, e.g.*, *in re Holocaust Victim Assets Litig.*, 225 F.3d 191, 198-199 (2d. Cir 2000) (denying intervention when intervenors "waited another eight months [after submitting a letter objecting to the settlement in question] before moving to intervene").

**B. Edwards' Motion for Summary Judgment.**

Plaintiffs have four remaining claims against Edwards:  (1) securities fraud under Rule 10b-5; (2) common law fraud; (3) breach of fiduciary duty; and (4) negligent misrepresentation.

### 1. Securities Fraud.

The elements of a private securities fraud claim based on a material misrepresentation or omission under Rule10b-5(b) are:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

Reliance is an "essential element" of a Rule 10b-5 action, which "ensures that, for liability to arise, the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury exists as a predicate for liability."  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  "In assessing the reasonableness of a plaintiff's alleged reliance, [the Court] considers the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."  *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

"'The traditional (and most direct) way' for a plaintiff to demonstrate reliance 'is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation."  *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 462 (2013) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011)).  Where a plaintiff can identify such a specific misrepresentation, a plaintiff "plainly would have relied on the company's deceptive conduct."  *Halliburton*, 563 U.S. at 810.

Meanwhile, the economic loss element exists largely so that where a plaintiff is defrauded as to the value of a stock, but the stock he purchases nevertheless causes him

economic gain, he cannot recover. *See Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 3738 (2d Cir. 2012) (discussing whether subsequent increase in stock price above inflated value of which defendant misinformed plaintiff precluded finding of economic loss).

Additionally, a plaintiff must prove loss causation. *In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010). Loss causation requires proving both that the wrongful act was the but-for cause of the economic loss and that the harm was proximately caused by the wrong to be of a sort that § 10(b) was intended to prevent. *Id.* As such, a misrepresentation is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations . . . ." *Id.* at 513 (emphasis omitted).

Alternatively, a plaintiff can also prove securities fraud under Rule 10b-5(a) and (c) if he can prove that the defendant:  (1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter; and (4) plaintiff relied on the deceptive act to his detriment. *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) (citing *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998)).[4]  A "manipulative or deceptive act" is defined broadly as "some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).

Essentially, Edwards argues that there are no disputed material facts, because there is no evidence that he ever made any misrepresentation or omission of material fact to either Goldberg or Amerio.  Plaintiffs counter by arguing that nine material facts are in their favor: (1) Edwards met with McEssy in Chicago to induce him to invest in Gray's Uber scheme;

---

[4] The Second Circuit does not appear to have ever established the elements of private civil liability for a scheme to defraud under Rule 10b-5(a) or (c). *See U.S. Envtl.*, 155 F.3d at 111. However, at the least Second Circuit caselaw has established that the SEC in bringing a Rule 10b-5(a) or (c) enforcement action must prove a manipulative or deceptive act in furtherance of the scheme and scienter. *Id.* Additionally, a private plaintiff in more traditional securities fraud cases must also prove reliance, even though the SEC need not, and thus it would logically follow that the same additional requirement applies in scheme to defraud cases. *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013).

(2) Edwards approved the PPMs despite their omission of Gray's disciplinary history;

(3) Edwards' background was listed with prominence in the PPMs; (4) Edwards used

Bennington to reassure DeCesare when she was unwilling to work with Gray; (5) Edwards

showed a strong knowledge in one of the Archipel investments in a meeting with McEssy;

(6) Edwards referred to himself as "chairman" and Gray's partner in Archipel when speaking

with McEssy; (7) Edwards downplayed Gray's disciplinary history to DeCesare and McEssy;

(8) Edwards told McEssy that he would have purchased some of the Uber shares had

McEssy not purchased them all himself; and (9) Stelljes' comments to plaintiffs over the

course of their investments.  Additionally, Goldberg specifically argues that Edwards did

nothing to stop Gray once Goldberg brought to Edwards' attention Gray's concerns regarding

the Twitter investment.

Plaintiffs' theory of the case follows two harmonic themes.  First, they argue that

Edwards misrepresented or omitted Gray's disciplinary history in the PPMs.  Alternatively,

plaintiffs argue Edwards engaged in a sprawling scheme with Gray to defraud all Archipel

investors, and among them plaintiffs, by lending his own credibility in the investment industry

to Gray's less vital reputation.

Ultimately, plaintiffs' argued evidence of Edwards' fraud falls into four camps:  (1) acts

plaintiffs would attribute to Edwards through BIM; (2) acts plaintiffs would attribute to Edwards

through Stelljes; (3) acts done by Edwards which reached people other than plaintiffs; and

(4) acts done by Edwards himself.

The first camp can be disposed of easily enough.  A district court facing a state law

question is bound to apply the choice-of-law rules of the state in which that court sits.  *Klaxon*

*Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Under New York's choice of law

rules, the law of the jurisdiction where the partnership was formed, in this case Delaware,

dictates how the partnership will be construed.  *See Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 485 (S.D.N.Y. 1996) (noting that New York assesses liability of partners of an out-of-state partnership under laws of jurisdiction where partnership was organized); Gray Dep. 12.

Under Delaware law, there is no authority that suggests that general partners can be held liable for the general partnership's acts, and in fact it seems that Delaware's legislature consciously reduced the scope of general partnership liability to prevent that form of liability from attaching.  *See McEssy*, 2019 WL 6829053, at *12-14.  Accordingly, Edwards cannot be held liable based on BIM's actions, and plaintiffs' arguments tying BIM's alleged misconduct to Edwards is misplaced.

The second type of evidence plaintiffs rely on, namely Stelljes' comments to them throughout their investment experience, is similarly ineffectual.  First, in the agency context, "New York's choice of law principles require a court to apply the law of the state with the most significant relationship with the particular issue in conflict . . . ."  *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 700 (N.Y. 2002).  Presumably, Stelljes worked at Archipel's offices in Buffalo, New York, and given the relative lack of contact between Stelljes and Edwards, to the extent that Stelljes' work can be attributed to Edwards in an agency context, New York law should govern whether an agency relationship existed.  Dkt. 279-5, p. 6, Edwards Dep. 52.

Under New York agency law, "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act."  *N.Y. Marine & Gen. Ins. Co. v. Tradeline, (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001) (citation omitted).  The authority for an agent to act on a principal's behalf can be either actual or apparent.  *Meisel v. Grunberg*, 651 F. Supp. 2d

98, 110 (S.D.N.Y. 2009).  Apparent authority is created by "the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him[.]"  *Minskoff v. Am. Express Travel Related Servs. Co., Inc.*, 98 F.3d 703, 708 (2d Cir. 1996).  A principal is liable for the torts of his agent if the agent acted within the scope of his actual or apparent authority.  *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 566 n.1304 (S.D.N.Y. 2014).

Even assuming that because a principal can be held liable for a tort committed by his agent, the actions of his agent are attributable as evidence of the principal's own tortious misconduct, plaintiffs have no evidence of an agency relationship between Stelljes and Edwards.  There is no evidence on the record that Edwards endowed Stelljes with actual authority, and although he might have had such a relationship with BIM, BIM's faults once again cannot be attributed to Edwards.  *McEssy*, 2019 WL 6829053 at *12-14 (ruling that Delaware law does not impose liability on partners for tortious acts of partnership). Accordingly, in the absence of actual authority, plaintiffs can only hold Edwards liable for Stelljes' actions to whatever extent Stelljes occupied a position of apparent authority.  *See Meisel*, 651 F. Supp. 2d at 110.

On that score, plaintiffs have offered nothing done by Edwards to confer on Stelljes the appearance of authority to act on his personal behalf.  On the contrary, the record only shows distance between Stelljes and Edwards, who only rarely even met.  Dkt. 279-5, p. 6. The closest Edwards ever comes to endorsing Stelljes in any way is sharing a biography page on the PPMs, but even those documents are silent as to Stelljes' relationship to Edwards.  *See* Dkt. 279-8, p. 11.  Accordingly, Stelljes did not have actual or apparent

authority to act as Edwards' agent, and Stelljes' statements to plaintiffs do not advance plaintiffs' claims.

The third camp of evidence plaintiffs muster, actions performed by Edwards but directed at people other than plaintiffs—namely his meetings and statements to McEssy and his efforts to convince DeCesare to work with Archipel—do, finally, carry some weight. Contrary to defendants' arguments, Edwards' efforts to convince McEssy and DeCesare could present evidence of a larger scheme to defraud intended to induce plaintiffs' investment, as well as scienter, even if that conduct was not directed at them. After all, a reasonable jury could conclude that if Edwards was willing to use his reputation and presence to attempt to coax others into working with Archipel on other occasions, it is possible that he was willing to do the same to deceive plaintiffs.

Of course, plaintiffs had no idea that Edwards met with McEssy and demonstrated knowledge of and optimism in the Archipel entities. Although at least Goldberg was aware that BELP was named for Bennington, rather than Archipel, there is nothing in the record to suggest that distinction was relevant to him or that he appreciated what it meant. Edwards Dep. 52. As a result, even this third grouping of evidence provides no support for the notion that plaintiffs relied on Edwards' alleged deceptive act of concealing Gray's disciplinary history and using his own reputation to bolster Gray's through the PPMs.

Accordingly, plaintiffs depend on the fourth category of evidence, Edwards' own acts directed toward them, to carry the day. That category consists of Edwards' submitting his biography for inclusion in the PPMs and his failure to prevent the PPMs from misleadingly representing Gray's credentials.

At the outset, there is no evidence that Edwards had anything to do with giving plaintiffs the PPMs. Goldberg Dep. 9-10 (Goldberg acknowledging that he never spoke to

Edwards prior to investing); Amerio Dep. 10 (Amerio noting that he read Edwards' name in the PPM as possibly his first time learning about Edwards).  Further, contrary to plaintiffs' arguments, Edwards' stylistic and cosmetic suggestions on an early draft of the PPMs are not enough to make the entire document attributable to him.  Edwards Dep. 14.  The same is true of plaintiffs' argument that Edwards' role as a general partner of BIM, which was itself a general partner of the Archipel entities, lays responsibility for the contents of the PPMs at Edwards' feet.  *McEssy*, 2019 WL 6829053, at *12-14.

Thus, nothing associated with them can be considered a misrepresentation or omission on Edwards' part, except for his biography.  Because plaintiffs have not pointed to any portion of the biography itself that is either a misrepresentation or an omission, plaintiffs have not identified any misrepresentation or omission by Edwards to them.  Accordingly, summary judgment must be granted to the extent plaintiffs are seeking to bring a Rule 10b-5(b) claim against Edwards.

As a result, the essential question becomes whether plaintiffs can establish that they reasonably relied on an alleged scheme to defraud involving Edwards' use of his reputation and concealment of Gray's discipline in investing in the Archipel entities.

As a first step, establishing what reliance would look like in terms of the scheme to defraud that plaintiffs argue is nettlesome.  It could be argued that they relied on Gray's qualifications being intact, his disciplinary history being disclosed, and Edwards' involvement being as substantial as his credentials.  Indeed, in a straightforward misrepresentation or omission case, plaintiffs could reasonably have relied on the truth of each of those perceptions, and Edwards would have been liable.  But in the context of a larger scheme to defraud, ensuring that the element of reliance continues to do the work ascribed to it requires more care.

After all, the purpose of a plaintiff's burden of proving reliance is to ensure a causal link between a defendant's misconduct and a plaintiff's injury. *Stoneridge*, 552 U.S. at 159. By extension, plaintiffs must prove not only that they believed that Gray had never been disciplined, that he was still appropriately licensed, and that Edwards would be involved in managing Archipel, but also that it was Edwards' alleged scheme to defraud them which caused them to believe those things and invest. In other words, plaintiffs must prove that they relied on Edwards to be the one to disclose Gray's discipline and that they relied on his reputation in investing. Neither plaintiff can.

Several factors counsel against Goldberg's argued reliance on Edwards' scheme to use his reputation and hide Gray's disciplinary history. First, as a college graduate, Goldberg is far from an unsophisticated party. Goldberg Dep. 3. Second, Goldberg had no direct interactions with Edwards until well after he had invested in the Archipel entities of which he was a member, at which point Goldberg only forwarded Edwards a single email chain. Edwards Dep. 39-40; Dkt. 279-22, pp. 7-8. Third, Gray's disciplinary history was not a well-kept secret; Goldberg's sister discovered it after a single internet search after having some concerns about Gray. Goldberg Dep. 15. Perhaps most critically of all, Goldberg remained invested in Archipel even after discovering Gray's disciplinary history, even though it clearly eroded his trust in Gray. Goldberg Dep. 17.

All told, Edwards' three actions of not revising the PPMs to clarify that Gray had been subjected to discipline, including his own expansive resume in the PPMs, and even agreeing to name BELP after Bennington does not count for much compared to a college graduate with easy access to the truth of Gray's past who stayed the course after discovering that truth. True, there is a difference between staying invested in a potentially lucrative venture and not entering that venture in the first place, but nevertheless it is impossible to believe that

Goldberg relied on Edwards to insist on disclosing Gray's disciplinary history when the two shared precious little contact.

The same is even more true to the extent that Goldberg hopes to prove reliance on Edwards' use of his own reputation to bolster Gray's sales pitch. After all, Goldberg never communicated with Edwards at any point before making an investment and in fact is unsure when he even first heard Edwards' name. Goldberg Dep. 10, 12. Of course, at some point Goldberg did learn about Edwards, and was impressed by his credentials, Dkt. 279-1, pp. 40-41, but being eventually impressed by Edwards' name and forwarding one email to Edwards after his relationship with Gray broke down is not enough to establish that Goldberg relied on Edwards' presence and reputation in investing in Archipel, Dkt. 279-1, p. 32; 279-22, pp. 7-8.

Amerio's claims fare no better. After all, Amerio is a highly sophisticated financial advisor in his own right. *See generally* Amerio Dep. 3-6. He knew going in that investing in startups such as those that Archipel finds is risky business, but he invested anyway. *Id.* at 15. What is more, Morakis, a trusted and respected friend, also vouched for the quality of the Archipel investments. *Id.* at 11. However, unlike Goldberg, Amerio at least knew that Edwards existed at the time he invested and that Gray referred to Edwards as his partner. *Id.* at 10. Both considerations and Edwards' credentials were factors, although not dispositive, in Amerio's decision to invest in Bloom. *Id.* at 12. However, despite his familiarity with Edwards in theory, the two never directly communicated. *Id.* at 27.

Weighing these competing factors, no reasonable jury could conclude that Amerio relied on Edwards to insist that the PPMs disclose Gray's disciplinary history and that Edwards was present as a partner. If Amerio truly relied on Edwards to bring Gray's disciplinary deficiencies to light, he would presumably have tried to confront Edwards in some

25

way when he discovered the deception.  But the record is utterly silent as to any such confrontation.  Moreover, there are other actors equally or more responsible for the PPMs not disclosing Gray's discipline, including the attorney who assembled the PPM and of course Gray himself.  Amerio provides no evidence to suggest that he relied on Edwards to insist on disclosure to the extent that he can be held culpable despite Gray's outright misrepresentation in the PPM and Archipel's lawyer's review of the document.

Moreover, Amerio never had any indication that Edwards would actively manage the Archipel entities, and Gray already had the strong backing of Morakis, whom Amerio deeply respected.  Amerio Dep. 11-12.  Given such a strong vote of confidence from an admired colleague, and given the dearth of evidence that Amerio actually expected Edwards to make the risky Archipel entities enough safer to tip his decision to invest from "maybe" to "yes," Amerio has not supplied sufficient evidence at the point of summary judgment to prove that Amerio relied on any scheme to defraud that Edwards may have concocted.

None of this is to suggest that Gray's disciplinary history was not an important concern, and that its being concealed from plaintiffs was not to their disadvantage.  Rather, it is safe to say that Edwards' role in that concealment as related to plaintiffs was incredibly minute.  It simply cannot be said that plaintiffs reasonably relied on an individual with whom they had such minimal contact to be the one to tell them the truth.  Accordingly, plaintiffs have failed to establish reliance on any scheme to defraud Edwards may have engaged in, and have altogether failed to prove reliance on any of Edwards' actions, fraudulent or otherwise. Accordingly, plaintiffs' securities fraud claims under Rule 10b-5 must be dismissed.

### 2. <u>Common Law Fraud.</u>

To recover damages for common law fraud under New York law, a plaintiff must prove four elements:  "(1) a misrepresentation or a material omission of fact which was false and

known to be false by [the] defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury."[5]  *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009).

Neither party disputes that the analysis of common law fraud and securities fraud is identical for the purposes of this case, given that the central issues at stake are reliance and the existence of a misrepresentation, omission, or scheme to defraud.  Accordingly, plaintiffs have also failed to establish a dispute of material fact as to whether Edwards defrauded them under the common law.  Those claims must also be dismissed.

### 3. Negligent Misrepresentation.

Under New York law, a claim for negligent misrepresentation requires the plaintiff to allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (citing *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir. 2000)).

The first element of whether the defendant had a special relationship to the plaintiff weighs several factors, including "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to

---

[5] Defendants note the possibility that under the applicable choice of law rules, Amerio, as a New Jersey resident who interacted with defendants in that state, may be subject to New Jersey law.  However, New York and New Jersey treat common law fraud much the same, so the distinction is without difference.  *Winter v. Am. Inst. of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 225 (S.D.N.Y. 2017).

which the information would be put and supplied it for that purpose." *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001) (citing *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996)).

Should a plaintiff prove the existence of a special relationship, the defendant is obligated to "exercise reasonable care in giving the information [because the] plaintiffs' reliance upon the information [is] foreseeable." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).

Under New Jersey law, by contrast, a negligent misrepresentation claim requires the plaintiff to prove only that "an incorrect statement was negligently made" by the defendant upon which the plaintiff "justifiably relied [in order] to recover damages for economic loss or injury sustained as a consequence of that reliance." *Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 793 (S.D.N.Y. 2011).

A plaintiff must also show that he relied on the defendant's misstatement, and that reliance was the proximate cause of his injury. *Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring,* 2020 WL 999209, at *12 & n.8 (D.N.J. Feb. 28, 2020) (noting that for both fraud and negligent misrepresentation reliance must proximately cause injury). One means of demonstrating reliance is to show that the defendant possessed superior knowledge. *Id.*

First, Goldberg has plainly failed to establish that Edwards owed him a special relationship as required by New York law. *Anschutz Corp.*, 690 F.3d at 114. Perhaps sensing the vulnerability of his argument that he had a special relationship with a financial advisor that never actually managed his accounts and with whom the sum total of his communication is a single forwarded email chain, Edwards Dec. ¶ 14; Edwards Dep. 23, 40; Dkt. 279-1, p. 32; 279-22, pp. 7-8, this plaintiff relies on the doctrine of law of the case to hold

the Court to its earlier determination on a motion to dismiss that Edwards had a special relationship to him through Archipel and BIM.

One circumstance in which law of the case is implicated is "when a court reconsiders its own ruling on an issue in the absence of an intervening ruling on the issue by a higher court." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).  In such a circumstance, the court should generally follow the earlier decision unless "cogent and compelling reasons militate otherwise[.]"  *Id.*

As defendants correctly note, law of the case is not applicable in the circumstances Goldberg presents.  First, law of the case "is discretionary and does not limit a court's power to reconsider its own decision prior to final judgment."  *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001).  Accordingly, the Court is not bound to follow its earlier decision.  In any event, the decision Goldberg relies on held only that, for the limited purposes of a motion to dismiss, he had adequately pled that Edwards owed him a duty of honesty arising from a special relationship.  *Goldberg v. Gray*, 2016 WL 4099189, at *10 (N.D.N.Y. Aug. 2, 2016).

The question now at issue is whether there is record evidence to support that Edwards had a special relationship with Goldberg.  There is none.  This plaintiff relies on partnership principles to impute a special relationship with this defendant, but there is nothing to suggest that under Delaware law Edwards' role as a general partner to BIM, which was itself a general partner of the Archipel entities in which Goldberg invested, would artificially create the necessary relationship.  *McEssy*, 2019 WL 6829053, at *12-14.

Additionally, as alluded to above, Goldberg has not created a disputed issue of material fact as to whether he and Edwards shared a special relationship based on their actual interactions.  The record is barren as to any interactions between Edwards and

Goldberg save the lone email chain that this plaintiff forwarded to this defendant. Edwards Dec. ¶ 14; Edwards Dep. 23, 40; Dkt. 279-1, p. 32; 279-22, pp. 7-8. Such a sparse record cannot sustain Goldberg's claim for a negligent misrepresentation, and thus that claim must be dismissed.

Similarly, neither plaintiff has alleged that Edwards actually made any misrepresentation to them. Unlike in cases of fraud, negligent misrepresentation claims require an actual misrepresentation, rather than a broader spectrum of deceptive conduct.[6] *See, e.g.*, *Anschutz Corp.*, 690 F.3d at 114 (including misrepresentation as element of negligent misrepresentation under New York law); *Thomas*, 811 F. Supp. 2d at 793 (same for New Jersey law).

The only statement that Edwards ever made to either plaintiff was providing his biography, which was adopted and included in the PPMs. Dkt. 279-8, p. 11. Plaintiffs have not alleged, argued, or proven that the biography itself contained any material misrepresentations, and thus plaintiffs have failed to provide any evidence on summary judgment that Edwards made a negligent misrepresentation to them. Accordingly, plaintiffs' negligent misrepresentation claims must be dismissed.[7]

### 4. **Breach of Fiduciary Duty.**

---

[6] Of course, both New York and New Jersey alternatively allow for claims of fraudulent omission, *Clark v. Prudential Ins. Co. of Am.*, 736 F. Supp. 2d 902, 907 (D. N.J. 2010); *Mandarin Tr. Ltd. v. Wildenstein*, 994 N.E.2d 1104, 1108 (N.Y. 2011), but plaintiffs have not pled that claim against Edwards, and cannot assert that claim for the first time at this late stage in litigation. In any event, because the only statement that Edwards ever made either plaintiff on this record is his biography in the PPMs, and he could hardly be expected to include an advertisement that Gray had a substantial disciplinary history in his own biography, that claim would be meritless in any case.

[7] Because the existence of a misrepresentation is a fundamental element under both New York and New Jersey law, the Court need not decide which law applies to Amerio's claim.

Under New York law,[8] a claim for a breach of fiduciary duty requires a plaintiff to prove:  (1) "the existence of a fiduciary duty"; (2) "a knowing breach of that duty"; and (3) "damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011).

A fiduciary duty can exist "when confidence is reposed on one side and there is resulting superiority and influence on the other." *Nuss v. Sabad*, 976 F. Supp. 2d 231, 248 (N.D.N.Y. 2013).  One useful gauge in whether that superiority and influence exists are ongoing interactions of trust and reliance between the plaintiff and defendant. *Id.*  Other barometers for a fiduciary duty include "reliance, de facto control and dominance." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016) (quoting *AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 896 N.E.2d 61, 68 (N.Y. 2008)).

In all, exact definitions of what constitutes a fiduciary relationship are "impossible to [state]," but a fiduciary relationship may be found in cases where "influence has been acquired and abused, [or] in which confidence has been reposed and betrayed." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 196 (S.D.N.Y. 2006).  However, courts routinely hold that parties dealing at an arm's length are not in a situation "of confidence or trust sufficient to find the existence of a fiduciary relationship" and thus no fiduciary duty "will arise absent extraordinary circumstances." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002).  It is up to the factfinder to determine if there was a fiduciary duty owed to the plaintiff based on the available evidence. *See id.*

---

[8] Once again, New Jersey and New York law are treated substantially similarly, which both parties acknowledge. Accordingly, the Court will apply New York law.  *See, e.g.*, *Schwarz v. ThinkStrategy Capital Mgmt. LLC*, 797 F. Supp. 2d 439, 447 n.43 (S.D.N.Y. 2011).

31

However, even if such a duty is owed, the defendant must have knowingly participated in the breach of that duty. *In re Platinum-Beechwood Litig.*, 400 F. Supp. 3d 2, 5 (S.D.N.Y. 2019). This requires the defendant to have taken some affirmative action in the breach by assisting in it, helping conceal it, or by otherwise failing to act when his duty requires he do so. *Id.* Finally, to support a claim for a breach of fiduciary duty, a plaintiff must establish that the breach proximately caused the damages he suffered. *Nordwind v. Rowland*, 584 F.3d 420, 433 (2d Cir. 2009).

Finally, plaintiffs have failed to establish that Edwards owed either of them a fiduciary duty. Familiar as the refrain must be by now, it must again be stressed that Edwards never managed their money or advised them on their investments. Edwards Dec. ¶ 14; *see* Edwards Dep. 23, 40. Neither did either plaintiff discuss their investments with Edwards at any point, except for when Goldberg forwarded him a single email chain. Dkt. 279-1, p. 32; 279-22, pp. 7-8. Plaintiffs had barely any relationship with Edwards at all, let alone one that would rise to the level of confidence or trust. *In re Mid-Island Hosp.*, 276 F.3d at 130. Instead, to the extent that plaintiffs interacted with Edwards, that relationship was at arms' length, and there is no further evidence to support a fiduciary relationship. *Id.*

Plaintiffs attempt to circumvent the lack of a direct connection between themselves and Edwards by describing the extent of his involvement in Archipel and BIM, but that is irrelevant to his relationship to plaintiffs specifically. Once again, it may be that BIM owed plaintiffs a fiduciary duty, and it may be that Edwards owed a fiduciary duty to BIM. But a fiduciary duty is inherently based on the relationship between the fiduciary and those relying on him, and it is not enough to be a fiduciary of a fiduciary. Accordingly, plaintiffs have failed to establish that Edwards was their fiduciary, and their breach of fiduciary duty claims against Edwards, and indeed all of their claims against Edwards, must be dismissed.

### C. **Plaintiffs' Claims Against Bennington.**

Defendants correctly note that given the paucity of evidence of Bennington or its agents acting within the scope of their agency to commit the torts plaintiffs allege, plaintiffs must establish "reverse" piercing of the corporate veil to hold Bennington liable for the tortious conduct they lay at Edwards' feet.  *See Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) (noting that piercing of corporate veil is necessary under New York law[9] to hold corporation liable for independent actions of its agents); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004) (describing that "reverse" veil-piercing is necessary to hold corporation liable for unrelated actions of its agents).

However, even assuming that plaintiffs could establish that reverse veil-piercing is appropriate in this case, for the reasons described above no conduct of Edwards, the only Bennington agent plaintiffs have identified,[10] amounted to a tort that could survive summary judgment.  Accordingly, just as all claims must be dismissed against Edwards, all claims must also be dismissed against Bennington.

### D. **Plaintiffs' Motion for Default Judgment.**

A "corporation may appear in the federal courts only through licensed counsel." *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201-02 (1993).  Therefore, "where a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it pursuant to Rule 55[.]"  *SEC v. Research Automation Corp.*, 521 F.2d 585, 589 (2d Cir. 1975); *accord Jacobs v. Patent Enf't Fund, Inc.*, 230 F.3d 565, 568 (2d Cir. 2000).  The same

---

[9] Because Bennington is a Canadian corporation, Canadian law on piercing of the corporate veil technically applies, but because neither party identifies any meaningful difference between the two bodies of corporate law, the Court will apply the more readily-accessible New York law.

[10] Bennington is a corporation whose sole purpose was to hold a Canadian securities license so that Edwards could provide advice to an unrelated venture capital fund.  Edwards Dec. ¶ 9.  Bennington was never directly involved in operating an Archipel entity.  *Id.*

prohibition extends to partnerships. *Leviton Mfg. Co., Inc. v. Fastmac Performance Upgrades, Inc.*, 2013 WL 4780045, at *2 (S.D.N.Y. July 8, 2013) (citing *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983)).

Having properly received an entry of default against BIM and Archipel ("the Archipel defendants"), plaintiffs have moved for default judgment against those defendants on Counts: (I) securities fraud; (IV) common law fraud; (V) negligent misrepresentation; and (VI) breach of fiduciary duty.[11]  The Archipel defendants have still yet to appear with licensed counsel, and at this point that failure more than adequately establishes default.  *Jacobs*, 230 F.3d at 568.  Accordingly, plaintiffs are entitled to default judgment against these defendants so long as plaintiffs' allegations establish liability against them as a matter of law.

### 1. <u>Facts Attributable to Each Defendant.</u>

However, the antecedent question to be answered is which facts in the complaint are attributable to which Archipel defendant.  To that end, under New York's choice of law rules, "the liability of partners of an out-of-state partnership [are judged] according to the laws of the jurisdiction where the partnership was organized."  *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 485 (S.D.N.Y. 1996).  Thus, because BIM was formed in Delaware, Delaware law applies.  Gray Dep. 12.

Under Delaware law, a partnership is liable for a loss or injury caused to a third party as a result of a wrongful act or omission by a partner within the course of partnership business.  6 DEL. C. § 15-305.  Therefore, BIM can be held liable both for the misconduct the complaint charges against it directly and for Gray's alleged misconduct within the course of partnership business.

---

[11] The SAC technically only asserts these claims against Gray, Edwards, and Bennington, without mention of BIM or Archipel as defendants for any claim.  However, each count also includes a paragraph which re-alleges every other allegation of the complaint, and other paragraphs charge BIM and Archipel as culpable actors. Thus, plaintiffs' claims against BIM and Archipel will be considered.

The same cannot be said of Archipel, which is a limited liability company formed under New York law.  Dkt. 132, ¶ 18.  In assessing the liability of a limited liability company, New York courts apply the law of the state under which the company is organized.  *See, e.g.*, *Finkelstein v. Warner Music Grp. Inc.*, 820 N.Y.S.2d 264, 266 (App. Div. 1st Dep't 2006) (noting that limited liability company formed in Delaware would have nature of claims as direct or derivative decided based on Delaware law).

To attribute the tortious acts of a member to a limited liability company under New York law, much like for corporate entities such as Bennington above, would-be plaintiffs must establish the "reverse" variant of the legal principle of piercing the corporate veil.  *Monteleone v. Leverage Grp.*, 2008 WL 4541124, at *9 (E.D.N.Y. Oct. 7, 2008) (citing *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997)) (applying reverse piercing the corporate veil to attribute liability for controller to limited liability company).  To pierce the corporate veil, New York law requires a plaintiff to prove both:  (1) "that the owner exercised complete domination over the [company] with respect to the transaction at issue"; and (2) that the domination itself was used to commit the wrong the injured party seeks to redress.  *See Am. Fuel Corp.*, 122 F.3d at 134.  Naturally, then, domination is necessary but not sufficient for the veil-piercing analysis.  *Id.*

In determining whether Archipel can be held liable for Gray's misconduct as well as its own to establish entitlement to default judgment, plaintiffs have failed to sufficiently demonstrate complete domination by Gray or Edwards, and thus have failed to pierce the corporate veil.  Although there can be little doubt that Gray exhibited a great deal of influence over Archipel, the SAC levies several allegations that both Edwards and Gray steered Archipel, and that Stelljes also exhibited a degree of control.  *See, e.g.*, Dkt. 132 ("SAC"), ¶¶ 69-70, 86, 137, 168, 174.  Moreover, the record evidence clarifies that Stelljes was a

frequent point of contact between Archipel and Goldberg, and that he was Archipel's Managing Director.  *See* Goldberg Dep. 8, 10; Dkt. 279-8, p. 11.

Accordingly, plaintiffs have not established that any one Archipel figure truly dominated its operations.  Thus, Archipel's liability can only be measured against the allegations that the complaint aims directly at the company.  *See, e.g.*, *Monteleone*, 2008 WL 4541124, at *9.

### 2.  Securities Fraud.

Once again, the elements of securities fraud under Rule10b-5(b) are:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Matrixx*, 563 U.S. at 37-38.

At the outset, both plaintiffs have sufficiently alleged that the losses they suffered as a result of their Archipel entity investments were connected to a security.  SAC ¶ 143.  Both plaintiffs also alleged in no uncertain terms that both Archipel and BIM "intentionally and fraudulently" misrepresented Gray's disciplinary history in the PPMs, which establishes the elements of a material misrepresentation and scienter.  *Id.* ¶ 162.  The SAC also alleges that plaintiffs relied on the information provided them, and that they would not have invested in the Archipel entities and lost their money if not for those statements.  *Id.* ¶¶ 181-82.  Finally, plaintiffs allege that they have suffered economic loss.  *Id.* ¶ 183.  Accordingly, plaintiffs have sufficiently alleged each element of securities fraud against both Archipel defendants, and default judgment must be granted in plaintiffs' favor on Count I.

### 3. **Common Law Fraud.**

The elements of common law fraud applicable in this case are: "(1) a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury." *Equifax*, 583 F.3d at 108.  Much as with the discussion of plaintiffs' securities and common law fraud claims above, there is sufficient overlap in the elements at play in the two counts that the analysis is identical.  Plaintiffs have adequately pled every element of common law fraud against both Archipel defendants, and therefore their motion for default judgment on Count IV must be granted.  SAC ¶¶ 162, 181-83.

### 4. **Negligent Misrepresentation.**

To prove his New York negligent misrepresentation claims against the Archipel defendants, Goldberg must once again prove: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz*, 690 F.3d at 114.

Goldberg has adequately alleged that defendants, a broad label that includes the Archipel defendants, failed to correct the misrepresentation in the PPMs that Gray was properly licensed despite knowing that the NYSE had stripped his licensure.  SAC ¶ 226.  He has also alleged that he reasonably relied on that information to his loss.  *Id.* ¶¶ 181-83.

Where Goldberg runs into trouble is in establishing a special relationship.  Of course, the SAC alleges that Gray and Edwards owed him such a relationship, which is enough for

37

liability to attach to BIM as a partnership.  SAC ¶ 225; 6 DEL. C. § 15-305.  However, Goldberg does not allege that Archipel itself, being a limited liability company and thus only liable for its own actions, had a special relationship with him.  *See* SAC ¶ 225.  Nevertheless, Goldberg specifically alleges that all defendants owed them a duty to act with reasonable care in disseminating information.  *Id.* ¶ 224.

Under New York law, that duty of care in dissemination explicitly emerges only from the existence of a special relationship.  *Anschutz*, 690 F.3d at 114 (noting that plaintiff must establish defendant's "duty, *as a result of* a special relationship, to give correct information" (emphasis added)).  In other words, by pleading that the duty exists, the necessary implication is that the special relationship existed first.  Accordingly, for the broad purposes of default judgment, Goldberg has sufficiently alleged that he and Archipel shared a special relationship, and default judgment must be granted in his favor as to Count V against both Archipel defendants.

To the extent that New York law governs Amerio's claims, the same logic requires default judgment in his favor on this count as well.   Alternatively, if his claims fall under New Jersey law, Amerio must prove that "an incorrect statement was negligently made" by the Archipel defendants upon which he "justifiably relied" and that he is thus entitled "to recover damages for economic loss or injury sustained as a consequence of that reliance."  *Thomas*, 811 F. Supp. 2d at 793.  Amerio has adequately alleged reliance on a negligently-made statement.  SAC ¶¶ 181-82, 226.  Of course, he has also alleged economic loss and injury.  *Id.* ¶ 183.  As a result, default judgment must also be granted for Amerio against both Archipel defendants on Count V.

### 5. **Breach of Fiduciary Duty.**

To sustain their claim for a breach of fiduciary duty, plaintiffs must again allege:

(1) "the existence of a fiduciary duty"; (2) "a knowing breach of that duty"; and (3) "damages

resulting therefrom." *Johnson*, 660 F.3d at 138. The issue of damages or breach is not at

issue for either plaintiff against either defendant, because the complaint alleges misconduct

up to and including outright fraud and resulting damages. SAC ¶¶ 162, 181-183. Similarly,

plaintiffs have alleged that all defendants owed plaintiffs several duties as fiduciaries.

*Id.* ¶ 223. Accordingly, plaintiffs have adequately alleged that all defendants owed them a

fiduciary duty, and default judgment must be granted as to Count VI as well.

### 6. **Plaintiffs' Remaining Claims Against the Archipel Defendants.**

Lastly, the Court informed plaintiffs in the March 31 decision that any count for which

they did not move for default judgment would be dismissed for failure to prosecute under

Rule 41(b). Plaintiffs timely moved for default judgment only on Counts (I) and (IV-VI). As a

result, plaintiffs' claims under Counts (II-III) and (VII-XII) are dismissed for failure to prosecute

under Rule 41(b). As for the claims to which plaintiffs are entitled to default judgment, an

assessment of damages and final judgment shall wait until plaintiffs' claims against Gray are

resolved.

### E. **Plaintiffs' Claims Against Gray.**

The bombardment of motion practice having at last grown silent, plaintiffs' claims

against Gray remain untouched as the smoke clears. All twelve counts of plaintiffs' SAC

remain in the field, and although trying this case will be much more manageable than it would

have been in the absence of the present motions, nevertheless several of plaintiffs' claims

against Gray would perhaps inject an unwarranted degree of complication. In this Court's

August 2, 2016 Memorandum-Decision and Order, all claims were dismissed against

Edwards and Bennington for failure to state a claim except Counts (I) and (IV-VI). *Goldberg v. Gray*, 2016 WL 4099189, at *16 (N.D.N.Y. Aug. 2, 2016). Accordingly, plaintiffs are ordered to show cause why Counts (II-III) and (VII-XII) should not be dismissed under Rule 56(f)(3) for the same reasons no later than Wednesday, August 12, 2020.

Of course, according to plaintiffs' allegations, Gray is more culpable than Edwards and Bennington ever were, and it is possible that some additional claims could survive review. Should plaintiffs wish to preserve those additional counts, they may explain why they should remain and why dismissal would be inappropriate.

## V.  **CONCLUSION**

Plaintiffs are understandably frustrated—to say the least—with their experience investing in the Archipel entities. This litigation and its scattered siblings sound an outraged keen at what they allege to be profound lies and manipulations which have taken from them an aggregate total of millions of dollars. The Court is not unmoved by their allegations, but nevertheless it must carefully safeguard its own mechanisms and procedures such that justice be done proportionate to whatever wrongs a finder of fact determines were caused by each defendant.

That justice would be best served to come swiftly. As a result, the would-be intervenors must be denied their intrusion into this case so that it can proceed to its resolution. Additionally, in the absence of any stronger indication of malfeasance than plaintiffs have mustered, Edwards and Bennington cannot be held to answer for the wrongs that plaintiffs allege. However, at the least plaintiffs have achieved an important victory in vindicating their rights by attaining default judgment against BIM and Archipel. All that remains now is to proceed onward toward trial of this matter, and the final determination of what else, if anything, plaintiffs are owed.

Therefore, it is

ORDERED that

1. The motion to intervene brought by Andrew C. Russo, Caroline Hardman, Lee Knight, Todd Morakis, and David Work is DENIED;

2. Gregory Edwards' and Bennington Investment Management, Inc.'s motions for summary judgment are GRANTED;

3. Plaintiffs' claims against Gregory Edwards and Bennington Investment Management, Inc. are DISMISSED;

4. Plaintiffs' motion for default judgment against BIM Management LP and Archipel Capital LLC under counts (I) securities fraud, (IV) common law fraud, (V) common law negligent misrepresentation, and (VI) common law breach of fiduciary duty is GRANTED;

5. Plaintiffs' claims against BIM Management LP and Archipel Capital LLC under Counts:  (II) Control Person Liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (III) the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962; (VII) common law conversion; (VIII) common law unjust enrichment; and (IX-XII) New York's Debtor and Creditor Law §§ 273-76 are DISMISSED for failure to prosecute under Rule 41(b);

6. Plaintiffs' damages under Counts (I), (IV), (V), and (VI) owed by BIM Management LP and Archipel Capital LLC will be ascertained after plaintiffs' claims against Gregory Gray are resolved;

7. Plaintiffs are ordered to show cause why summary judgment should not be granted in Gregory Gray's favor as to counts (II-III) and (VII-XII) no later than Wednesday, August 12, 2020; and

41

8. A date for a jury trial on the merits of plaintiffs' remaining claims against defendant

Gregory Gray and for damages as to BIM Management LP and Archipel Capital

LLC will be set.

It is SO ORDERED.

Dated:  July 21, 2020
        Utica, New York.

David N. Hurd
U.S. District Judge